# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Rivera*, 2011 IL App (2d) 091060

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN A. RIVERA, JR., Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-09-1060 |
| Filed | December 9, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder was reversed, notwithstanding defendant's confession, since the State failed to establish the offense *aliunde* the confession, there was no physical evidence linking defendant to the offense, and the DNA evidence did not link defendant to the offense, and under the circumstances, the State's evidence was insufficient to establish defendant's guilt beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 92-CF-2751; the Hon. Christopher C. Starck, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Thomas P. Sullivan and Terri L. Mascherin, both of Jenner & Block, LLP, and Jane E. Raley and Jeffrey Urdangen, both of Bluhm Legal Clinic, Northwestern University, both of Chicago, and Lawrence C. Marshall, of Stanford Law School, of Stanford, California, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer, Jay Paul Hoffmann, and Edward R. Psenicka, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Kimball R. Anderson, of Winston & Strawn LLP, of Chicago, for *amici curiae* Chicago Alliance Against Sexual Exploitation, Illinois Coalition Against Sexual Assault, National Crime Victims Law Institute, and Victim Rights Law Center.

Craig R. Culbertson and Jacob P. Hildner, both of McGuireWoods LLP, of Chicago, and Nathalie Gilfoyle, of American Psychological Association, of Washington, D.C., for *amicus curiae* American Psychological Association.

James L. Kaplan and Holly M. Spurlock, both of DLA Piper LLP, of Chicago, and Monica N. Dournaee, of DLA Piper LLP, of Los Angeles, California, for *amicus curiae* Innocence Network.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices McLaren and Bowman concurred in the judgment and opinion.

## OPINION

¶ 1    In May 2009, following a jury trial, defendant, Juan A. Rivera, Jr., was convicted of first-degree murder for the 1992 killing of 11-year-old Holly Staker, the victim. The trial court sentenced defendant to life imprisonment without the possibility of parole. Thereafter the trial court denied defendant's posttrial motions, and defendant filed a timely notice of appeal. Defendant presents seven issues for review: (1) whether the State presented sufficient evidence to prove his guilt beyond a reasonable doubt; (2) whether his constitutional rights were violated when the trial court excluded certain expert witness testimony relating to the effects his psychiatric and psychological conditions were apt to have had on him and on the

reliability of his statements during questioning using particular interrogative techniques; (3) whether evidence relating to the victim's sexual history violated the Illinois rape shield statute and the rules of evidence; (4) whether defendant should have been allowed to examine a witness regarding polygraph examinations; (5) whether the trial court violated this court's earlier mandate and Illinois evidence law when it allowed the State to present evidence regarding malfunctions in electronic monitoring units other than the one assigned to defendant; (6) whether defendant was denied the right to present a defense when the trial court excluded defense evidence rebutting the State's claim that defendant knew facts that only the perpetrator could have known; and (7) whether defendant's statements should have been suppressed as involuntary. Because the State's evidence was insufficient to sustain the jury's verdict, we reverse. Accordingly, we do not reach the remaining issues.

¶ 2        On August 17, 1992, police responded to a call in Waukegan after a woman living there, Dawn Engelbrecht, reported that her babysitter, Holly Staker, was missing. The back door to Engelbrecht's apartment had been kicked in. The police found the victim's partially clothed body on the floor of the children's bedroom. The victim had been stabbed multiple times and was pronounced dead at the scene. An investigation led police to question defendant, who purportedly gave incriminating responses to the officers' questions. Defendant later signed a statement in which he confessed to killing the victim.

¶ 3        On November 12, 1992, a grand jury indicted defendant on four counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 1992)). Defendant was convicted in a November 1993 jury trial, but on appeal this court reversed and remanded for a new trial. See *People v. Rivera*, No. 2-94-0075 (1996) (unpublished order under Supreme Court Rule 23). Defendant was retried in 1998 and was convicted in a jury trial. The jury found defendant not guilty of one count of intentional murder, but guilty of the other three counts of murder: knowledge of great bodily harm (720 ILCS 5/9-1(a)(2) (West 1992)); in the course of an aggravated criminal sexual assault with a weapon (720 ILCS 5/9-1(a)(3), 12-14(a)(1) (West 1992)); and in the course of an aggravated criminal sexual assault of a victim under the age of 13 (720 ILCS 5/9-1(a)(3), 12-14(b)(1) (West 1992)). On appeal, this court affirmed defendant's conviction. See *People v. Rivera*, 333 Ill. App. 3d 1092 (2001).

¶ 4        In 2004, the trial court granted defendant's motion for DNA testing of material from vaginal swabs taken at the victim's autopsy. In 2005, a forensic testing company tested sperm from a swab stick, and the vial in which it had been held, and made a finding that defendant was "excluded as the source of the DNA obtained from the swab and vial." Both the State and the defense accept the conclusion and no challenge is made to it. The DNA results have been run in the federal and state databases, but no match has been found to date. In 2006, based on the forensic testing company's finding, the trial court granted defendant's petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)).

¶ 5        In May 2009, defendant's present jury trial commenced. In its opening statement, the State claimed that the evidence would show that, on August 17, 1992, defendant sexually assaulted the victim by penetrating her vagina and anus, and then defendant stabbed the victim 27 times, including in the neck, the throat, 5 clusters around the heart, and the vagina. The State presented evidence pertaining to the crime scene and the analysis of the physical

evidence collected. Evidence technicians took samples of blood found in the bedroom and near the kitchen sink, where it appeared that someone had washed bloodied hands. Technicians lifted fingerprints from the apartment and removed the damaged back door for forensic analysis. They took photographs and samples of bloody streaks near the banister on the front staircase. Investigators discovered a knife broken into two pieces in a neighbor's yard.

¶ 6      Dr. Nancy Jones testified that she performed the autopsy of the victim. Jones testified that the victim had suffered 27 stab wounds, had been strangled, and had incurred massive injuries as a result of having been sexually assaulted vaginally and anally prior to her death. Jones took vaginal and anal swabs, which were sent to the Northern Illinois Police Crime Laboratory (the Crime Lab). The Crime Lab determined that the vaginal swabs tested positive for semen, and spermatozoa were found on slides generated from the swabs.

¶ 7      William Wilson, a forensic scientist with the Crime Lab, testified that he analyzed the damaged back door and determined that some of the damage was caused by a blue object approximately one inch in diameter. Following an investigation, Wilson determined that the handle from a blue mop found on the back porch was consistent in size and color with some of the damage to the door. Deputy Bert Foster reported on a towel found next to the mop.

¶ 8      The State presented evidence of the Lake County police department's investigation and interrogation of defendant. On October 2, 1992, defendant met with officers and agreed to provide samples of his blood and hair. Defendant signed a statement for the officers, reflecting that, on the night of August 17, he had been at a party at Shanita Craig's house, close to where the victim's murder occurred. In the statement, defendant described a male individual, who came and left the party repeatedly, and who later returned sweaty, out of breath, and with a fresh scratch. Defendant indicated that the male individual might have been on "coke" because he was acting paranoid. Following an investigation by the police, it was revealed that there was no party at the Craig residence on August 17.

¶ 9      On October 27, 1992, defendant was transferred to the Lake County jail. Defendant took a polygraph test, which yielded no results. On October 28, 1992, at approximately 9:30 a.m., the police began their interrogation of defendant. In the hours that followed, defendant gave various accounts, including a statement substantively similar to the one he gave police on October 2. On October 29, 1992, Detective James Held and Detective Richard Davis continued the interrogation of defendant and requested that he undergo another polygraph test. Throughout the day and night, defendant continued to give the interrogating police officers, who also included Corporal Michael Blazincic, Detective Meadie, Sergeant Fernando Shipley, and Sergeant Charles Fagan, varying accounts of his whereabouts and activities on August 17. At approximately 3 a.m. on October 30, 1992, Meadie and Fagan left the interrogation to prepare and type a statement summarizing defendant's new version of the events. In that statement, defendant explained that the victim was attired in "a sleeveless shirt and a pair of tight shorts." Defendant stated that he went to the bathroom, and when he returned to the living room, the victim "must have changed clothes, because she was wearing a nightgown or similar type garment." Defendant stated that he and the victim engaged in consensual vaginal and anal intercourse and that he did not use any "protection" during intercourse; defendant stated that he did not think he ejaculated. Defendant stated that

-4-

the victim left the bedroom and returned with a knife and began striking him. Defendant stated that they continued fighting "and that was when [he] started punching [the victim] not realizing [he] had the knife in [his] hand." At approximately 8:10 a.m., Meadie and Fagan entered defendant's cell with the prepared statement. Fagan read aloud the statement, and defendant signed each page they had drafted. Fagan and Meadie left the cell.

¶ 10    The interrogation continued, and the detectives told defendant that two other investigators wished to interview him, and Sergeant Lou Tessmann and Sergeant Michael Maley joined them. Following further interrogation, Tessmann and Maley left to prepare an investigative report with another version of events; Sergeant David Ostertag continued with the interrogation. At approximately 1:15 p.m., Maley and Tessmann returned and read aloud a statement they had prepared for defendant, again incriminating him in the victim's murder. In this statement, defendant saw the victim "standing at the Mexican lady's front door," and she asked him into the apartment. Defendant stated that he did "not remember what the little kids were wearing, but [the victim] had on some black stretch pants with stirrups on the bottoms and a multi-colored shirt." Defendant stated that the victim was teasing him, which angered him. Defendant stated that he took a knife from the kitchen and they began fighting; the victim "was getting cut by the knife." Defendant stated that he pushed the victim onto the bed and had vaginal and anal intercourse with her. Defendant stated that he could not recall whether he ejaculated on the victim or whether he ejaculated at all. Defendant went to the kitchen sink and washed the knife and his hands. Defendant stated that he left the apartment "through the back door," which he closed behind him. Defendant stated that he "wanted to make it look like a burlgary [sic] break in, so I grabbed a mop that was leaning outside this door in the hallway." Defendant stated that he "then grabbed a towel, that was laying on the floor and wiped any fingerprints off the mop because [he] did not wear gloves." Defendant signed the three-page statement, and he was thereafter charged with the victim's murder.

¶ 11    At trial, Tessmann admitted that he might have asked questions that contained facts of the murder, such as "She had a multi-colored shirt on, right?" Maley admitted that, during the interrogation, he questioned defendant as to whether the victim was really wearing a nightgown. Maley testified that Tessmann asked questions "about facts in the previous statement that he believed were untrue."

¶ 12    The State called two witnesses, Michael Jackson and Maurice Craig, who both testified that there was no party at the Craig house on August 17, 1992. Jackson further testified that, while defendant was in the Lake County jail, defendant asked him to provide an alibi for him because the police were railroading him for a crime he did not commit. Dawn Engelbrecht testified that, on August 17, 1992, while the police were at her home collecting evidence, a crowd gathered in the street and someone approached her. Engelbrecht testified that, although she later identified defendant as that person, she did so only because the police had shown her photos of him and told her that he had admitted being the person who approached her in the street.

¶ 13    The State called Heather Staker, the victim's twin sister, to challenge the DNA evidence. Staker testified that, when she and the victim were eight years of age, a friend's brother molested them by forcing them to perform oral sex. Staker also testified regarding an incident in which she and the victim once showed each other how they masturbated.

¶ 14     The State also presented testimony from three informants from the Lake County jail regarding claims that defendant allegedly made to each of them in the jail. Edward Martin, who had been convicted of aggravated criminal sexual assault of his stepdaughter, informed the police that defendant might have some information as a witness. The 1993 trial testimony of Frank McDonald, now deceased, was presented as evidence. According to McDonald, defendant had asked him to read the discovery materials to him, and upon reading the materials, he accused defendant of killing the victim. According to McDonald, defendant admitted that he had. McDonald admitted that he had attempted to sell defendant's discovery materials to a reporter for the Chicago Tribune. The 1998 trial testimony of David Crespo was read to the jury. According to Crespo, he and defendant attended a Spanish Bible study class together; after one class, defendant admitted that he killed the victim. Crespo admitted that, when he left the jail, defendant's family took him in and that he came forward with his claim about defendant only after defendant's family made him leave their residence for using drugs while living there. The State rested.

¶ 15     Defendant presented two theories of defense: (1) he did not commit the crime as claimed by the State; and (2) his incriminating statements during the police interrogation were false and inaccurate. Defendant relied on testimony regarding the DNA results; electronic monitoring system records; the absence of any physical evidence linking defendant to the crime; defendant's condition during the police interrogation; defendant's mental health and its impact on his statements; inconsistencies and inaccuracies between defendant's statements and the circumstances of the crime; and the lack of information from defendant to the police that was unknown to the police or the general public.

¶ 16     Defendant presented the testimony of Alan Keel, of Forensic Science Associates, who conducted DNA testing on evidence from the rape kit taken at the victim's autopsy, *i.e.*, one of two vaginal swabs and the vial in which the swab had been stored. Keel performed a "differential extraction" to separate the sperm cells from the epithelial cells and determined that the epithelial cells all matched the victim and that the sperm was from a single male profile, which he labeled as "Unidentified Male #1." Keel tested the profile against that of defendant and determined conclusively that defendant was not the source of the sperm.

¶ 17     The State asked Keel whether some initial difficulties in performing the differential extraction, or the state of the tails on the sperm cells, suggested that the sperm may have been old and degraded by having been in the vagina for several days before the autopsy. Keel disagreed and testified that the opposite was true, *i.e.*, the high ratio of sperm cells to epithelial cells indicated that the sperm was deposited shortly before the victim died. Keel explained that the "high ratio of sperm DNA to epithelial cell DNA demonstrat[ed] that the semen had not been in the vagina long" and "[i]t had not had time to dissipate"; and he opined that the sperm had been "recently deposited in the vagina." Other expert witnesses testified that they could not rule out the State's degradation theory but testified that it was not likely. Brian Wraxall testified that it was a possibility but it was misleading. Elizabeth Benzinger testified that it was a possibility but she did not have any data that really described that. The expert witnesses confirmed that semen in the vagina tends to drain onto the underwear during the normal course of activity after intercourse; no semen was found on the victim's underwear.

¶ 18 William Frank, the senior DNA analyst for the Illinois State Police crime laboratory, testified that, at the joint request of the parties, the police crime lab conducted a quality control review of the results of Keel's testing. Frank agreed with Keel's conclusion that the profile was a single-source male DNA profile and that "there was no indication that the sample was mixed with DNA from more than one male." At the State's request, the police crime lab conducted independent testing of the evidence and found that defendant was absolutely excluded. Frank agreed with Keel that there was no evidence reflecting contamination in any manner.

¶ 19 On cross-examination, the State asked Frank whether he could rule out the possibility that the swab or vial was improperly handled in such a manner that created "a contact transfer with some other sperm from some other case." Frank responded that, because the degradation levels of the victim's epithelial cells and the sperm from "Unidentified Male #1" were similar, any such contamination would have had to occur by the evidence coming in contact with someone else's sperm from another case early on. Frank testified that the DNA testing revealed a "single source profile," and there was no evidence to reflect that the epithelial cells and the sperm were not deposited at the same time.

¶ 20 Defendant presented stipulations regarding the fingerprints found at the crime scene and examined by Robert Wilson of the Crime Lab and Donald Verbeke of the Lake County State's Attorney's office. Wilson and Verbeke compared the lifted prints with prints from known sources, including defendant, the victim, Dawn Engelbrecht, Engelbrecht's children, the victim's sister, and the victim's mother. Many of the prints belonged to the residents of the apartment, the victim, and the victim's sister. None of the prints analyzed by Wilson or Verbeke matched those of defendant. Some prints could not be matched to any known prints and were referred to as "open." Kenneth Moses, a crime scene investigator and director of an independent forensics laboratory in San Francisco, testified regarding his review of the physical evidence, including approximately 70 images of finger and palm prints. Moses testified that an unidentified print was referred to as an "open" print. Moses concluded that all of the open prints excluded defendant; that is, the prints were not defendant's.

¶ 21 Defendant also presented testimony from witnesses regarding the home electronic monitoring system and records related to defendant's use of the monitoring system. Lake County jail employees testified regarding defendant's mental and physical condition during the night and morning he gave police the incriminating statements. Defendant called expert witnesses to testify regarding his mental health; his IQ of 79; and his third-grade reading level. Defendant called other witnesses, including police officers, who testified regarding the inconsistencies between defendant's statements to the police and the true facts of the crime.

¶ 22 After defendant rested, the State presented its rebuttal. The parties presented their closing arguments, and the trial court instructed the jury. Following deliberations, the jury found defendant not guilty of first-degree murder based on the knowledge that his acts created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1992)), but found him guilty of the two other counts of first-degree murder based on the underlying aggravated criminal sexual assault charges (720 ILCS 5/9-1(a)(3), 12-14(a)(1), (b)(1) (West 1992)). The trial court entered judgment on the jury's verdict. On June 25, 2009, the trial court denied defendant's motion for judgment notwithstanding the verdict or, alternatively,

for a new trial. The trial court thereafter sentenced defendant to life imprisonment without the possibility of parole. Defendant timely appeals.

¶ 23    Defendant contends that the State's evidence was insufficient to prove his guilt beyond a reasonable doubt. Defendant argues that the undisputed DNA testing excludes him as the source of the sperm on the vaginal swab taken at the victim's autopsy; the State's response to this exculpatory evidence was to offer unproved and speculative scenarios "so unreasonable, improbable or unsatisfactory" as to compel reasonable doubt of defendant's guilt; and the inculpatory evidence was so wanting that no reasonable trier of fact could conclude that it trumped the force of the exculpatory DNA evidence and other evidence excluding defendant. In short, defendant claims that DNA trumps all other evidence.

¶ 24    When a court reviews the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). Reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). Thus, the standard of review gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 25    While credibility of witnesses is within the province of the trier of fact, and the finding of the jury on such matters is entitled to great weight, the jury's determination is not conclusive. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). It is our duty to carefully examine the evidence while giving due consideration to the fact that the jury saw and heard the witnesses. See *Smith*, 185 Ill. 2d at 541 (citing *People v. Bartall*, 98 Ill. 2d 294, 306 (1983)). If after such consideration we are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction. *Smith*, 185 Ill. 2d at 541 (citing *Bartall*, 98 Ill. 2d at 306). Insufficient evidence is that which is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 26    As noted above, a jury convicted defendant of two counts of first-degree murder based on the underlying aggravated criminal sexual assault charges. "When a defendant is charged with first-degree murder, the State is required to prove death, causation and intent (or knowledge)." *People v. Jerome*, 206 Ill. App. 3d 428, 436 (1990); see also 720 ILCS 5/9-1(a) (West 1992). A person commits first-degree murder when he or she kills an individual without lawful justification during the attempt or commission of a forcible felony other than second-degree murder. 720 ILCS 5/9-1(a)(3) (West 1992). One such "forcible felony" is the offense of aggravated criminal sexual assault. See 720 ILCS 5/2-8 (West 1992). A person commits aggravated criminal sexual assault when he or she commits criminal sexual assault–that is, sexual penetration by the use of force–accompanied by a statutorily enumerated aggravating factor. 720 ILCS 5/12-14(a) (West 1992). Here, the statutorily

-8-

enumerated aggravating factors included the use of a dangerous weapon (720 ILCS 5/12-14(a)(1) (West 1992)) and the ages of the parties at the time of the offense: defendant, who was over the age of 17 years, and the victim, who was under the age of 13 years (720 ILCS 5/12-14(b)(1) (West 1992)).

¶ 27　　Due process requires that, to sustain a conviction of a criminal offense, the State must prove beyond a reasonable doubt the existence of every element of the offense. *People v. Lucas*, 231 Ill. 2d 169, 178 (2008) (citing *Jackson*, 443 U.S. at 316). Therefore, to sustain the guilty verdicts, the State was required to establish beyond a reasonable doubt the victim's age; defendant's age; defendant's use of a dangerous weapon; defendant's sexual penetration of the victim by the use of force; and the victim's death during the attempt or commission of the aggravated criminal sexual assault. Defendant does not challenge the State's evidence with respect to his age or the age of the victim.

¶ 28　　The State asserts that, under the applicable standard of review, its evidence was sufficient. The State acknowledges that there was no eyewitness testimony or forensic evidence positively connecting defendant with the crime. The State responds, however, that defendant's confession and the circumstances under which it occurred were sufficient for a reasonable jury to find him guilty beyond a reasonable doubt. The State additionally claims that defendant knew details of the crime and that there was no evidence that defendant was "fed" any details of the crime to support his confession.

¶ 29　　First, we discuss the physical evidence linking defendant to the offense. There was none. The State and defendant presented a stipulation that, although there were many fingerprints lifted from the Engelbrecht residence that were suitable for comparison, no fingerprints were matched to defendant. Further, Moses concluded that the open prints, those which had not been identified, excluded defendant. The blood found in the bedroom was not matched to defendant. The physical evidence with respect to the damaged back door was not matched to defendant. The bloody streaks near the banister on the front staircase were not matched to defendant. The knife, which was broken into two pieces and found in a neighbor's yard, was not matched to defendant. The blue mop handle and towel were not matched to defendant.

¶ 30　　With respect to the DNA evidence linking defendant to the offense, there was none. Keel, who conducted DNA testing on evidence from the rape kit taken at the victim's autopsy, *i.e.*, one of two vaginal swabs and the vial in which the swab had been stored, determined that the epithelial cells all matched the victim and that the sperm was from a single male profile, which he labeled as "Unidentified Male #1." Keel determined conclusively that defendant was not the source of the sperm. Keel also testified that the high ratio of sperm cells to epithelial cells indicated that the sperm was deposited shortly before the victim died.

¶ 31　　We recognize that DNA, in and of itself, does not confirm the commission of a crime; rather, it confirms an individual's identity. *People v. Edwards*, 353 Ill. App. 3d 475, 486 (2004). Defendant was positively excluded as the source of the sperm found in the victim. However, that the DNA evidence does not match defendant's DNA does not exonerate defendant. See, *e.g.*, *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) (positive eyewitness testimony linked the defendant to an offense despite the lack of DNA evidence). In other

words, and contrary to defendant's claim, DNA does not trump all other evidence. DNA evidence, while not completely exculpatory, is significantly important nonetheless in that it may raise a reasonable doubt as to the identity of the perpetrator. In the present case, the DNA evidence established that "Unidentified Male #1" engaged in some sort of sexual relations with the victim shortly before she died, which supported defendant's theory that he did not sexually penetrate the victim by the use of force nor did he cause the victim's death during the attempt or commission of an aggravated criminal sexual assault. In other words, the DNA evidence provides no support to the State's theory that defendant was the individual who committed the offense beyond a reasonable doubt; rather, the DNA evidence embedded reasonable doubt deep into the State's theory.

¶ 32    To counter the DNA evidence, the State presented two alternative theories: (1) the vaginal swab stick had been contaminated, or (2) the victim had previously engaged in sexual activity with another male. The State acknowledges that contamination of the sample may have been unlikely; however, it argues that contamination was not ruled out. The State also argues that it presented evidence to "suggest" that the victim might have been sexually active in the days before the murder. The State's evidence included anecdotal testimony from the victim's sister recounting a masturbation experience and an alleged sexual molestation three years prior by a neighborhood friend's brother.

¶ 33    In light of all the evidence, the State's theories are highly improbable. First, the scientific evidence does not support the State's contamination theory. Second, according to the State in its opening statement, defendant sexually penetrated the victim both vaginally and anally; he stabbed her 27 times in the neck, throat, vagina, and 5 clusters around her heart. Convicting defendant required the jury to be convinced beyond a reasonable doubt that (1) the victim engaged in some sort of sexual relations with "Unidentified Male #1" shortly before (2) defendant, without using a condom or some other prophylactic contrivance, violently perpetrated an aggravated criminal sexual assault upon the victim and murdered her, without leaving any physical trace of his presence at the Engelbrecht residence, on the victim, or in the surrounding area, yet (3) leaving intact the sperm from "Unidentified Male #1" in the victim's body. The State's attempt seems to have been to separate the DNA evidence in a dimension of time from the sexual assault and murder, so that the evidence tending to exonerate defendant would not be relevant.

¶ 34    In the abstract, the State's theories might not be physically impossible, but on the present record, a reasonable fact finder could not credit them beyond a reasonable doubt. See *People v. Herman*, 407 Ill. App. 3d 688 (2011) (finding the victim's changing time line of events an important inconsistency that helped cast a reasonable doubt as to the defendant's guilt). The State presented anecdotal testimony supporting its theory that contamination was possible, but even so, it still was not likely. The State's theories distort to an absurd degree the real and undisputed testimony that the sperm was deposited shortly before the victim died. Simply put, the State's rationalizations of how the DNA from "Unidentified Male #1" came to be found in the victim's body ("as unlikely as it seems, this young girl apparently had sex with someone else") and why none of defendant's DNA appeared in or around the victim or anywhere at the crime scene cannot save a conviction obtained on a theory of a violent sexual assault and murder. The State did not present any evidence that the victim was in a

relationship with anyone. The undisputed evidence from the trial reflects that there was only one male whose bodily fluids were found on the victim; this male was not defendant but rather "Unidentified Male #1." The most reasonable explanation of the DNA evidence is not defendant but rather "Unidentified Male #1." The most reasonable explanation of who sexually penetrated the victim, based on the DNA evidence, is not defendant but rather "Unidentified Male #1." The most reasonable explanation, therefore, of who murdered the victim is not defendant but rather someone who, unfortunately, has not yet been identified.

¶ 35 Although the DNA evidence does not completely exonerate defendant, it significantly impeaches the theory of the State's case, that defendant committed murder while perpetrating a sexual assault. However, despite the absence of any DNA or physical evidence linking defendant to the offense, we recognize that, under Illinois law, "medical evidence is not necessary to prove a defendant guilty of aggravated criminal sexual assault." *People v. York*, 312 Ill. App. 3d 434, 440 (2000) (citing *People v. Fryer*, 247 Ill. App. 3d 1051, 1058 (1993)). We, therefore, turn to the State's anecdotal evidence, that is, the testimony from the jailhouse informants, and defendant's confession to the police to determine whether that evidence was sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 36 A jailhouse informant is someone who is purporting to testify about admissions made to him or her by an accused while incarcerated in a penal institution contemporaneously. See 725 ILCS 5/115-21(a) (West 2010). The credibility of informant testimony is a matter for a jury and can be the basis for a guilty verdict. *People v. Manning*, 182 Ill. 2d 193, 210-11 (1998). However, such testimony should be treated with caution. *People v. Williams*, 65 Ill. 2d 258, 267 (1976); see also *People v. Mertz*, 218 Ill. 2d 1, 60 (2005) (contrasting the reliability and admissibility of statements made by an accused and those made by jailhouse informants, suggesting that jailhouse informants are not inherently reliable).

¶ 37 As we stated earlier, the State presented the testimony of Edward Martin, who had been convicted of aggravated criminal sexual assault of his stepdaughter. Martin informed the police that defendant might have some information as a witness. The 1993 trial testimony of Frank McDonald, now deceased, reflected that defendant had asked McDonald to read the discovery materials to him, and upon reading the materials, he accused defendant of killing the victim. According to McDonald, defendant admitted that he had. However, McDonald admitted that he had attempted to sell defendant's discovery materials to a reporter for the Chicago Tribune. According to David Crespo's 1998 trial testimony, he and defendant attended a Spanish Bible study class together; after one class, defendant admitted that he killed the victim. However, Crespo admitted that, when he left the jail, defendant's family took him in and that he came forward with his claim about defendant only after defendant's family made him leave their residence for using drugs while living there.

¶ 38 Although the testimony of a single witness is sufficient to convict if positive and credible (*People v. Flores*, 406 Ill. App. 3d 566, 577 (2010) (citing *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009))), given the effective cross-examination by defense counsel to expose the clear motivations of McDonald and Crespo to testify, we find that no reasonable trier of fact could have found the jailhouse informants' testimony credible beyond a reasonable doubt. Unlike in capital cases, where the trial court must conduct a hearing on the reliability and admissibility of jailhouse informant testimony (see 725 ILCS 5/115-21(a) (West 2010)),

there was no such pretrial safeguard in place here. The record contains no information as to the prosecutor's procedures, administrative or otherwise, to ascertain the reliability of the claims made by Martin, McDonald, or Crespo or their veracity. See Barry Scheck, *Closing Remarks*, 23 Cardozo L. Rev. 899 (2002) (analyzing 62 postconviction DNA cases to determine the extent of perjurious jailhouse informants and finding 15 such cases where snitches provided false testimony). Therefore, it was left to adversarial examination by defense counsel to test the truthfulness of and the motivations behind the jailhouse informants' testimony. McDonald's testimony was questioned by his attempt to sell discovery materials to a reporter. When a witness has hopes of a reward from the prosecution, the testimony should not be accepted unless it carries with it an absolute conviction of its truth. *People v. Hermens*, 5 Ill. 2d 277, 285-86 (1955). Similarly here, because defense counsel exposed McDonald's motivation to profit financially by involving himself in the case, his testimony should be subject to suspicion, viewed with distrust, scrutinized carefully, and acted upon with caution. See *Hermens*, 5 Ill. 2d at 285. Crespo was exposed as a drug user, who came forward only after defendant's family turned their backs on him for using drugs while staying at their house. Our supreme court has plainly stated that "the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." *People v. Lewis*, 25 Ill. 2d 396, 399 (1962) (citing *People v. Boyd*, 17 Ill. 2d 321, 326 (1959)).

¶ 39      A fact finder's acceptance of certain testimony does not guarantee its reasonableness. See *Smith*, 185 Ill. 2d at 545. "[A] reviewing court may find, after considering the whole record, that flaws in the testimony made it impossible for any fact finder reasonably to accept any part of it." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Inasmuch as the testimony from Martin, McDonald, and Crespo provided crucial support to the State's case, given McDonald's and Crespo's blatant motivations as well as the DNA evidence, it is simply unreasonable to sustain the finding of guilt beyond a reasonable doubt.

¶ 40      We are left with defendant's confession to the police. When an individual has been charged with a crime and confesses to that crime, the "corroboration rule requires that the *corpus delicti* be proved by some evidence *aliunde* admission of a defendant." *People v. Dalton*, 91 Ill. 2d 22, 29 (1982). That is, the State must introduce evidence, outside of the confession, that tends to prove that the offense occurred. *People v. Lambert*, 104 Ill. 2d 375, 380-81 (1984). The basis for this requirement stems from a long-standing mistrust of extrajudicial confessions. *People v. Furby*, 138 Ill. 2d 434, 447 (1990) (citing *Dalton*, 91 Ill. 2d at 29). The *Dalton* court cited two reasons for this mistrust: "confessions are unreliable if coerced; and, for various psychological reasons persons 'confess' to crimes that either have never occurred or for which they are not legally responsible." *Dalton*, 91 Ill. 2d at 29. Moreover, " '[e]xperience has shown that untrue confessions may be given to gain publicity, to shield another, to avoid apparent peril, or for other reasons, and because of this, the law demands corroborating proof that a crime did in fact occur before the individual is punished therefor.' " *Lambert*, 104 Ill. 2d at 380 (quoting *People v. O'Neil*, 18 Ill. 2d 461, 464 (1960)). Innocent people do confess to crimes they did not commit. See Saul M. Kassin, *Inside Interrogation: Why Innocent People Confess*, 32 Am. J. Trial Advoc. 525 (2009). Some people confess from fatigue, stress, and being worn down through relentless questioning and

sleep deprivation; some people confess out of fear; some people confess with the expectation of future exoneration; some people confess due to coercive or suggestive methods of interrogation. *Id.* Some people confess because they are guilty. See *People v. Stanton*, 16 Ill. 2d 459, 466 (1959) ("A confession is a voluntary acknowledgment of guilt after the perpetration of an offense ***.").

¶ 41     In this case, the State was required to prove two concepts to prove an offense: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged. See *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004) (citing *People v. Cloutier*, 156 Ill. 2d 483, 503 (1993)). Proof of *corpus delicti* requires both proof of injury or loss and proof of criminal agency. *Lambert*, 104 Ill. 2d at 379. *Corpus delicti* cannot be proved by the defendant's confession alone. *Id.* When the defendant's confession is relied upon to prove the offense, independent or corroborating evidence must be present. *Id.* The independent evidence and details of the confession are not required to correspond in every particular. *Furby*, 138 Ill. 2d at 451. However, the State's independent evidence must inspire belief in the defendant's confession. *Cloutier*, 156 Ill. 2d at 503; *People v. Curry*, 296 Ill. App. 3d 559, 565 (1998).

¶ 42     The State asserts that defendant's earliest statement, "while not confessing the crime," was nonetheless inculpatory in light of the circumstances and its "dishonest nature." The State asserts that the later statements included a "damning knowledge of the facts," including many that he "would not have known unless he had been involved." The State further asserts that there was no evidence that defendant was "fed" any details of the crime. At oral argument, the State conceded that Detective Martin "embellished" his testimony at trial, but argued that he was still credible. At oral argument, the State conceded that defendant lied many times during police questioning and gave many stories; however, at oral argument and in its brief, the State recounted the "correct" facts from his statements: he seemed to be familiar with the layout of Engelbrecht's living room; the Engelbrecht residence was messy; the children's room had two beds and a dresser; the victim was attired in a multi-colored blouse and dark stirrup pants; the murder weapon was a knife; he illustrated a stabbing; he stated that the knife was broken before it was discarded; and the victim was just beginning to develop pubic hair.

¶ 43     On our review of the record, the State's independent evidence does not inspire belief in defendant's candid acknowledgment of guilt. The State acknowledges that 15 of the 54 "facts" contained in defendant's statements had all been published in newspapers, and it acknowledges that defendant's father had learned about the crime in the newspapers and on television and discussed it with defendant. Although the State argues that no evidence reflected that defendant had read the newspapers or which specific details of the crime defendant's father had discussed with defendant, this does not establish defendant's independent knowledge of the facts beyond a reasonable doubt. See *Lucas*, 231 Ill. 2d at 178 (citing *Jackson*, 443 U.S. at 316) (noting that due process requires the State to prove beyond a reasonable doubt the existence of every element of the offense). It was the State's burden to establish that defendant had not read the newspapers or was not otherwise privy to these details. It was the State's burden to establish that defendant's father had not discussed with defendant the media coverage of the murder.

¶ 44    Contrary to the State's argument that there was no evidence that the police fed information to defendant, the record reflects that officers used leading questions during their interrogation of defendant. Both Maley and Tessmann interrogated defendant using facts of the case. Maley testified that, during the interrogation, he questioned defendant as to whether the victim was really wearing a nightgown. Tessmann admitted using leading questions regarding the victim's attire, asking "She had a multi-colored shirt on, right?" Maley's testimony reflected that Tessmann asked defendant questions "about facts in the previous statement that he believed were untrue." Following this session of interrogation, defendant's new statement reflected the victim's correct attire, that was "black stretch pants with stirrups on the bottoms and a multi-colored shirt." *Cf. People v. Nelson*, 235 Ill. 2d 386, 432 (2009) (noting that the defendant's confession and videotaped statement disclosed facts of murder, home invasion, and aggravated arson that could not have been suggested to him because the autopsy had not yet been performed and the police had been unable to enter parts of the crime scene). Moreover, Engelbrecht testified that she identified defendant only because the police had shown her photos of him and told her that he had admitted being the person who approached her in the street. The evidence belies the State's argument and supports an inference that details of the crime were provided to defendant, intentionally or unintentionally, during the investigative process. The evidence further supports an inference that the details that defendant provided were the result of psychological suggestion or linguistic manipulation. See, *e.g.*, Kathryn C. Donoghue, Comment, *"You Think He Got Shot? Did You Maybe Shoot Him by Accident?": Linguistic Manipulation of the Communicatively Immature During Police Interrogations*, 13 Rich. J.L. & Pub. Int. 143 (2009) (examining linguistic strategies of police interrogators used to extract confessions from vulnerable populations, such as juveniles and people who are mentally challenged). Given the circumstances surrounding the interrogation of defendant, we are left with the impression that the details of defendant's confession were procured "piecemeal" and not as a result of a candid acknowledgment of guilt. Over the course of four days, there were no fewer than 10 law enforcement personnel discussing the crime with defendant or interrogating him. It was the State's burden to establish that defendant was not plied with factual information of the crime to which he finally confessed.

¶ 45    Because defendant's confession was the only remaining evidence connecting him to the victim's sexual assault and murder, the State was required to present evidence *aliunde* the confession to prove the offense. See *Ehlert*, 211 Ill. 2d at 202; *Dalton*, 91 Ill. 2d at 29. The State failed to provide sufficient independent evidence to corroborate defendant's confession, especially in light of the DNA evidence. The State failed to provide corroboration for defendant's use of a dangerous weapon; defendant's sexual penetration of the victim by the use of force; and the victim's death during the attempt or commission of the aggravated criminal sexual assault. The only evidence of defendant's commission of the offense came from the statements that the police prepared for defendant to sign. Because the State failed to establish the offense *aliunde* the confession, defendant's conviction was unjustified and cannot stand.

¶ 46    After viewing the evidence in the light most favorable to the prosecution, we hold that *no* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. Because the State's evidence was insufficient to establish guilt beyond a reasonable doubt, we must reverse the conviction of Juan A. Rivera, Jr. See *Smith*, 185 Ill. 2d at 541 (citing *Bartall*, 98 Ill. 2d at 306).

¶ 47　　In so holding, this court is cognizant of the impact this decision will have upon Holly Staker's family, Mr. Rivera and his family, and their friends. Throughout the years, the Stakers have invariably suffered unspeakable anguish and frustration resulting from Holly's tragic murder and the legal proceedings that followed. Mr. Rivera, too, has suffered the nightmare of wrongful incarceration. Each time this matter was before this court, our duty was to examine the legal issues raised and the evidence that was presented at trial and to uphold the standard of reasonable doubt. This court did so each time. See *People v. Rivera*, 333 Ill. App. 3d 1092 (2001); *People v. Rivera*, No. 2-94-0075 (1996) (unpublished order under Supreme Court Rule 23). This court has done so again now.

¶ 48　　For the foregoing reasons, we reverse the judgment of the circuit court of Lake County.

¶ 49　　Reversed.