# Illinois Official Reports

## Appellate Court

*People v. McCullough*, 2015 IL App (2d) 121364

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACK D. McCULLOUGH, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-1364 |
| Filed | February 11, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the murder of a seven-year-old girl in 1957 was affirmed and his convictions for kidnapping and abduction of the girl were vacated, notwithstanding his contention that he was not proved guilty beyond a reasonable doubt, since the evidence was sufficient for any rational trier of fact to find that all of the elements of the crimes at issue were proved beyond a reasonable doubt, despite the passage of many years, including identification testimony, details related to the scene of the abduction, the testimony of police involved in investigating the "cold case," the testimony of inmates housed with defendant, and testimony related to the victim's autopsy. |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 11-CF-454; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

| Counsel on Appeal | Thomas A. Lilien and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Richard H. Schmack, State's Attorney, of Sycamore (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Schostok and Justice Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a bench trial in 2012, defendant, Jack D. McCullough, was convicted of the 1957 kidnapping and murder of seven-year-old Maria Ridulph. He appeals. We affirm in part and vacate in part.

¶ 2                                I. BACKGROUND
¶ 3                      A. December 3, 1957 Through April 26, 1958
¶ 4     On December 3, 1957, seven-year-old Maria Ridulph lived with her family on Archie Place in Sycamore, Illinois. She was a second-grade student at West School. Her friend Kathy Sigman, who lived four or five houses away from Maria, was eight and attended third grade at West School. Defendant, who was 18 years of age in 1957 and was known then as John Tessier, lived with his family at 227 Center Cross Street, approximately a block and a half or two blocks from Maria's house. Sycamore in the 1950s was described by witnesses as a rural farm town, a place where people did not lock their doors.

¶ 5     The corner of Archie Place and Center Cross Street was a gathering place for the neighborhood children, where they played games like hide-and-seek. There was a large tree at that corner, and the corner was lit by a streetlight. After dinner on the evening of Tuesday, December 3, 1957, Maria and Kathy were allowed to play together at the corner, in the season's first snow. Maria ate dinner at 5 p.m., and Kathy's dinnertime was 5:30 p.m. At just before 6 p.m., Kathy and Maria arrived at the corner and played "duck-the-cars," a game where they would run behind the large tree to avoid being lit up by the headlights of cars on Center Cross Street, which was also known as state Route 23.

¶ 6     At trial in 2012, Kathy was 63 years old. Her married name was Mary Sigman Chapman, although she still went by her nickname, Kathy. Chapman testified that, as she and Maria were playing at the corner of Archie Place and Center Cross Street at 6 p.m. on December 3, 1957, a man approached them, walking from the south. Chapman testified that it was "very, very dark" outside but that it was not dark on the corner with the streetlight "shining down." Chapman described the man who approached them as having a slender face, a flip in the side of his hair, and large teeth. On cross-examination, Chapman described the man as an "older person," which she clarified as being, to her eight-year-old self, someone twice as old as she

was. According to Chapman, the man, whom she did not know, was slender, maybe 150 pounds, and was wearing a sweater with a lot of colors in it and jeans.

¶ 7        Chapman testified that the man introduced himself as "Johnny." Johnny asked the girls if they liked dolls and if they would like a piggyback ride. Maria accepted a piggyback ride, and when Johnny and Maria returned to the corner, Maria ran home, three doors away, to get a doll. According to Chapman, she observed Johnny under the streetlight while they waited for Maria to return with her doll. Chapman testified that, after Maria ran back to them with her doll, Chapman went home to get mittens for her cold hands. When Chapman got back to the corner, Maria should have been there but was not.

¶ 8        Chapman testified that she went to Maria's house, thinking that Maria had gone home. According to Chapman, Maria's brother, Charles, said, "She still must be hiding from you," and told her to keep looking for Maria. Chapman testified that she went back outside to look for Maria but did not find her. At that time, she went to her own home and told her mother about "Johnny and Maria." Her mother called the police. According to Chapman, over the next several months the police and the FBI showed her thousands of photographs and took her to possibly 20 lineups, but she never identified anyone and was never shown a photograph of "Johnny."

¶ 9        Charles, who was 11 years old in 1957, testified that the family ate dinner promptly at 5 p.m. and that he and a friend were listening to records after dinner when Chapman came to the door saying that she could not find Maria. Charles also recalled that Maria's bedtime was always at 8 p.m. and that Maria would be in their mother's room reading books for a period leading up to her bedtime. Maria did not come home on the night of December 3, 1957. That night and the next day, the town organized a search. Still, Maria was not found over the next days, weeks, or months. Then, during the weekend of April 26, 1958, Charles was on a camping trip when his parents received a telephone call.

¶ 10        On April 26, 1958, James T. Furlong, a funeral director and the coroner of Jo Daviess County, Illinois, assisted in recovering the remains of a female child from among some timber about a half mile off Route 20 in Jo Daviess County. Furlong, 88 years old at the time of trial, testified that the body was found on the ground and that it had some clothes and one sock on it. According to Furlong, the body was "in bad shape from the length of time [it] was out in the timber." Furlong testified that he took the body to his funeral home in Galena, Illinois. Furlong identified People's exhibit No. 10 as a certified copy of the coroner's inquest report of the death of Maria Ridulph, dated June 3, 1958. Without objection, the portion of the report that contained the autopsy protocol was introduced into evidence.

¶ 11        The autopsy protocol indicated the following. At 11:30 p.m. on the night of April 26, 1958, Dr. K.M. Truemner conducted the autopsy at the Furlong Funeral Home. Furlong, the De Kalb County State's Attorney, and members of the Illinois State Police and the FBI attended the autopsy. The body was identified as Maria's from dental records. The body lay in a supine position on the mortuary table, partially rotated to the left, with the left hip and knee flexed, the left arm extended parallel to the body, and the right arm flexed at the elbow and wrist, lying across the lower chest and upper abdomen. The right leg was extended and slightly externally rotated. According to the autopsy protocol, the body was clad in one pair of brownish-tan ankle-length socks, a soiled black and white checked shirt, and a cotton knit undershirt.

¶ 12    Dr. Truemner noted that the body was "complete in the sense of skeletal articulation." He noted extensive soft-tissue loss. However, he also noted that the soft tissues were retained over the right anterior upper chest, right shoulder girdle, and right upper arm to the elbow. The skin and soft tissues were intact over the posterior surface of the trunk to the level of the lower rib margins. The viscera were completely absent. The lungs, heart, esophagus, aorta, and thoracic soft tissues were completely absent "except for remnants of the upper trachea retracted upwards into the base of the neck." With respect to the neck organs, Dr. Truemner stated that the soft tissues of the neck, including the larynx, "are shrunken into a tough sclerotic [(rigid)] mass." Dr. Truemner stated that "dissection is virtually impossible." He continued, "It is impossible to recognize evidence of laryngeal or hyoid fracture" or evidence of interstitial bleeding in the soft tissues of the cervical prevertebral space. Dr. Truemner examined the head and found that the bony surface of the "intact" skull "shows no fracture or penetrating wound." Dr. Truemner found no fracture of the bony skeleton, "with special attention to the skull and cervical spine." The only wounds Dr. Truemner found were the results of "known trauma prior to the subject's disappearance," namely, a laceration of the sole of the left foot and a probable vaccination scar on the left thigh. As to the cause of death, Dr. Truemner concluded that "I can draw no conclusion on this subject." He elaborated by stating that the poor preservation of the body due to the effects of the elements and the ravages of small animals "rendered this doubtful from the outset *unless the mechanism had been some form of obvious, gross, mechanical trauma.*" (Emphasis added.)

¶ 13    Maria was buried in May 1958. The case went cold for the next 50 years.


                                    B. 2008 Through 2012

¶ 15    In October 2008, the Illinois State Police began investigating Maria's disappearance, as a result of information supplied by defendant's half-sister, Janet Tessier. As part of the investigation, Special Agent Brion Hanley first spoke with Chapman on September 1, 2010, for approximately an hour and a half. At that meeting, according to Chapman, Hanley asked if she remembered anything about Maria's disappearance. Chapman testified that she gave Hanley "the exact information that I [could] remember back from 1957." On September 9, 2010, Hanley showed Chapman a photo array consisting of six black and white photographs of what appear to be teenage males circa the 1950s. All are clean-shaven and smiling, similar in age, with similar hairstyles that might be expected of that era. Chapman identified defendant's photo as that of the "Johnny" who gave Maria the piggyback ride on December 3, 1957.

¶ 16    Hanley testified that the photos were obtained from a 1950s yearbook. According to Hanley, he laid the photos down one at a time in front of Chapman. Gradually, Chapman eliminated every photo except number four, which was defendant's photo. According to Hanley, Chapman picked out number four and said, "That is him." The photo shows a young man with a slender face, hair worn short on the sides and longer on top, and prominent teeth.

¶ 17    On June 29, 2011, Sycamore police officers, accompanied by Seattle police officers, executed a search warrant at defendant's Seattle, Washington, residence. Sycamore sergeant Steven Cook testified that, while he was in defendant's residence, he saw defendant's wife open a safe. Inside the safe was a box of ammunition. According to Sergeant Cook, the fact that defendant's wife opened the safe was never released to the public. On July 1, 2011, an arrest warrant was issued for defendant, and extradition proceedings were initiated.

¶ 18    On July 27, 2011, defendant was extradited to Illinois. That same day, Maria's body was exhumed and a second autopsy was performed. On August 19, 2011, a grand jury indicted defendant on three counts: count I charged him with Maria's murder (Ill. Rev. Stat. 1957, ch. 38, ¶ 358); count II charged defendant with kidnapping (Ill. Rev. Stat. 1957, ch. 38, ¶ 384); and count III charged defendant with abduction of an infant (Ill. Rev. Stat. 1957, ch. 38, ¶ 385). Counts II and III of the indictment alleged that the applicable limitations periods were tolled due to defendant's absence from Illinois for various periods, commencing on December 11, 1957.

¶ 19                                    C. Pretrial Motions

¶ 20    Defendant filed a motion *in limine* requesting that certain FBI reports that were created during the 1957 investigation be admitted on the basis that they contained exculpatory evidence, specifically evidence of an alibi that had otherwise disappeared due to the witnesses' deaths. The first report reflected that defendant was known as John Samuel Cherry and that the authors of the report referred to him as "Cherry."

¶ 21    The first report indicates that the information it contained was received by the FBI via a telephone interview on December 10, 1957, with Air Force staff sergeant Jon Oswald. The report states that Oswald advised the FBI of the following information, which Oswald had obtained directly from Cherry. Cherry had been sent to Chicago on December 2, 1957, for a physical examination and was rejected by the Air Force because of a spot on his lung. Cherry stayed over in Chicago and was reexamined on the morning of December 3, 1957, and was again rejected for the same reason. The Air Force gave Cherry a train ticket to Rockford. At this point, Oswald broke off the narrative of what Cherry told him to state his own opinion that furnishing a train ticket was a "highly irregular procedure." Oswald further stated that he telephonically contacted "Chicago" to verify Cherry's story. According to Oswald, he learned that the ticket was furnished by the Army Reserve unit located on Van Buren Street, but "no verification of the information could be obtained at the time of calling." Oswald then resumed the narrative. Cherry stayed in Chicago on December 3, 1957, visited some burlesque shows, and then took the 5:15 p.m. train to Rockford, arriving at 6:45 p.m. In Rockford, Cherry contacted Colonel Liberwitz of the Air Force Reserve at approximately 7:15 p.m. or 7:30 p.m. and told Liberwitz that he had been instructed to report to the recruiting office in Rockford.

¶ 22    At this point, the report indicates that Oswald related to the FBI the following conversation between Oswald and Liberwitz. Liberwitz found Cherry's story hard to believe, because it was known that the recruiting office was not open in the evening. Cherry gave Liberwitz the appearance of being a "narcotic," and Cherry said that he was rejected by the Air Force because he was "unstable." Liberwitz directed Cherry to contact Technical Sergeant Froom on the third floor of the recruiting office.

¶ 23    Here, the report indicates that Oswald related his conversation with Froom. Cherry appeared "bewildered" and looked and acted like a "lost sheep." Cherry said that he was going to contact his father to come to Rockford to get him.

¶ 24    Oswald related to the FBI that on December 4, 1957, Cherry returned to the recruiting office in Rockford, where Oswald met Cherry for the first time. The following is Oswald's account of that meeting. Cherry mentioned that it was a good thing that he was not in Sycamore the night before when the girl disappeared. No details of the disappearance were

discussed except for the fact that there had been search parties looking for the girl. Cherry stated that he would not be considered a suspect, because his girlfriend's father was a deputy sheriff. Cherry had a "little black book" containing the names and addresses of girls in Sycamore with their bust and hip sizes. Cherry was wearing an "odd colored flashy" shirt with a string necktie. Cherry was not wearing a hat but was wearing a brown jacket. Oswald noted a "slight cut" across Cherry's upper lip that appeared to be fresh and could have occurred while shaving.

¶ 25    Another FBI report contained the following information pertinent to a possible alibi. On December 8, 1957, defendant's stepfather, Ralph Tessier, reported that he had discussed with his wife, Eileen Tessier, that defendant might fall under suspicion because defendant fit the general description of the perpetrator. Ralph reported that defendant was in Rockford at the Air Force recruiting office on the evening of December 3, 1957, and had placed a collect call from Rockford to the Tessier home in Sycamore at about 7:10 p.m. Ralph further reported that defendant had been in Chicago on the Monday preceding December 3, 1957, and was rejected by the Air Force because of a spot on his lung.

¶ 26    A third FBI report touching upon a possible alibi indicated that Eileen, defendant's mother, was interviewed on December 8, 1957, and said that defendant had called home collect from Rockford at 7:10 p.m. on the evening of December 3, 1957, and that Ralph had gone to Rockford to pick up defendant that evening. A fourth report indicated that the general manager of the Sycamore-Ogle Telephone Company reported that his records reflected that a collect call was placed from a certain number in Rockford on December 3, 1957, at approximately 6:57 p.m. to a number in Sycamore listed to Ralph E. Tessier. The records further revealed that the collect call was made by one "John S. Tassier" and that the call lasted until 6:59 p.m. The general manager told the FBI that he thought the operator who handled the call had misspelled the name "Tessier."

¶ 27    Defendant sought admission of the FBI reports either as ancient documents or as public records, arguing an exception to the rule that police reports are not admissible, because, in this case, the defendant rather than the prosecution was seeking their admission. Defendant also argued that due process required their admission where all of his alibi witnesses were deceased after the passage of 55 years. The court denied defendant's motion to introduce the FBI reports.

¶ 28    The State filed a motion *in limine* to bar defendant from introducing a former Sycamore police lieutenant's theory that someone other than defendant committed the crime. As the fortieth anniversary of Maria's disappearance approached in 1997, Lieutenant Patrick J. Solar penned a document entitled "Report on the Closure of the Maria Ridulph Kidnap/Murder Case." In the document, Solar opined that a man suspected in a 1951 Pennsylvania murder was "far and away" the best suspect in the Ridulph case. The suspect, one William Henry Redmond, died in 1992. In the document, Solar stated that the facts of the Pennsylvania case coupled with other facts "create a level of certainty that [Redmond] is responsible for [Maria's] abduction which is greater than mere suspicion." In the next paragraph, Solar stated, "We will never know for certain if Redmond was responsible for the crime." At the time of trial, Solar was alive and could have testified to what was contained in his document. The trial court granted the State's motion to bar and ruled that Solar's testimony would have been speculative and remote.

¶ 29    In another motion *in limine*, the State requested that a 1994 deathbed statement made by Eileen be admitted as a statement against her penal interest. At the time of trial, Eileen was deceased. According to the State's motion, Eileen made the following statement to her daughter Janet allegedly regarding defendant's involvement in Maria's murder: "Those two little girls, one disappeared, John did it." The State contended that, when Eileen made that statement, she exposed herself to criminal liability, because she had given prior contrary statements to the police and the FBI. The court granted the State's motion to admit the statement as a statement against Eileen's penal interest.

¶ 30                                    D. The Trial

¶ 31    At trial, Charles and Chapman testified as recounted above. The State also introduced evidence of the recovery of Maria's body and the first autopsy as recounted above. In order to keep the narrative of the events as chronological as possible, we resume here with the evidence surrounding the evening of December 3, 1957, in Sycamore following Maria's disappearance.

¶ 32    In December 1957, Cheryl Crain was a sophomore at Sycamore High School. After dinner on December 3, 1957, Crain and her friend Janice Edwards went to Edwards' father's hobby shop in Sycamore to decorate it for Christmas. According to Crain, defendant, who was Edwards' boyfriend, was supposed to give Crain a ride home when they finished decorating the shop. While the girls were decorating, Crain heard police loudspeakers and "knew something was going on." Then Crain's father called and told her to lock the shop door. Shortly thereafter, Crain's father came to get her and Edwards. Crain testified that she did not see defendant that night and that he did not call the shop.

¶ 33    Dennis Twadell lived in Sycamore and was a friend of defendant's in 1957. According to Twadell, defendant had a 1948 coupe. Twadell recalled that the coupe was "battleship gray" and that defendant would not allow anyone else to drive it. Twadell described defendant in 1957 as about 6 feet tall, 150 to 160 pounds, with sandy blond hair worn short. According to Twadell, in the winter defendant wore flannel shirts and sweaters. Twadell testified that defendant's sweaters were solid colors or multicolored. Twadell testified that, on the evening of December 3, 1957, he learned from members of his church that Maria was missing and that people were forming search parties. He testified that he called defendant, who was not at home. Twadell did not see defendant that night. On cross-examination, Twadell admitted that, when he was interviewed by the police in 2010, he had no recollection of anything unusual occurring on December 3, 1957, until the police refreshed his recollection.

¶ 34    Katheran Caulfield was known as Katheran Tessier in 1957. Defendant is her half-brother. Besides Caulfield and defendant, there were five other siblings plus her parents, Ralph and Eileen, living at their house, which she described as a "small house" on Center Cross Street in Sycamore. Caulfield testified that defendant slept on the first floor and that the girls slept in a converted attic on the second floor. According to Caulfield, in 1957 defendant was just under 6 feet tall and "kind of gangly" with wavy hair. She described him as having "like a do-up hairdo on the top." According to Caulfield, defendant "frequently" wore a multicolored sweater that their mother had knit for him. Caulfield testified that she never saw that sweater again after December 3, 1957.

¶ 35        Caulfield testified that she knew Maria because it was a small neighborhood and all of the children played together, although Maria had never come over to the Tessier home. According to Caulfield, because defendant was so much older, he never played with Maria.

¶ 36        Caulfield testified that her father drove her home from a 4-H gathering in De Kalb, Illinois, at 7 p.m. on December 3, 1957. Caulfield testified that they drove into Sycamore and saw a lot of police cars with flashing lights close to Center Cross Street and that there were people "outside everywhere walking and looking." Caulfield testified that she went directly into her house and that her mother, her sister Jeanne, and her brother Bob were home. According to Caulfield, her mother and father were "very upset" and went out to search for Maria, while she, Jeanne, and Bob stayed in the living room, with the front door locked. Caulfield testified that the side door to the house did not lock, so her father secured it with a piece of plywood. According to Caulfield, by the time she went to bed at 11:30 p.m. or 11:45 p.m., defendant had not come home. She testified that she had not seen defendant for "probably" the prior couple of days.

¶ 37        Caulfield testified that Eileen was interviewed by the FBI on December 4, 1957. The trial court admitted Caulfield's description of the conversation because the conversation pertained to Eileen's deathbed declaration. According to Caulfield, she and Jeanne were present in the living room for the conversation. Caulfield testified that the FBI agents asked Eileen about defendant's whereabouts the previous evening, December 3, 1957, and that Eileen told the agents that defendant was home. Caulfield testified that she knew that defendant was not home the previous evening.

¶ 38        Caulfield next testified about summer day trips that her family, including defendant, took every year. She testified that typical trips would be to Starved Rock State Park or to the Apple River in the Galena area.

¶ 39        Caulfield also testified that in 1957 defendant had a 1940s two-passenger "grayish-beigish" coupe with flames painted on the sides. Caulfield recalled that defendant's coupe was not at the home on December 3, 1957. On cross-examination, she said that defendant was not at home when she woke up on December 4, 1957.

¶ 40        Jeanne, also defendant's half-sister, testified that in 1957 defendant was thin and wore his hair curly on top and swept back on the sides. She testified that defendant played with other children in the neighborhood in approximately 1952, but not in 1957. According to Jeanne, Maria had never been to the Tessier home and Jeanne had never been to Maria's home. She recalled that on the evening of December 3, 1957, her father went out searching for Maria, and her mother went to the armory to help make coffee and sandwiches for the searchers. That evening, according to Jeanne, defendant was not at home. Jeanne testified that she stayed alone in the living room that night so that she could let her parents in the front door when they came home. She testified that she was asleep when her mother came home in the middle of the night. According to Jeanne, a few days later, she was present when her mother spoke with law enforcement officers in the living room. Jeanne testified that the officers asked whether defendant came home on the evening of December 3, 1957, and that her mother stated that he did. According to Jeanne, defendant was not at home that evening. On cross-examination, Jeanne testified that she did not see defendant on the morning of December 4, 1957, although she might have seen him sometime during that day.

¶ 41        Pamela Long had lived with her family in Sycamore in the 1950s. She testified that "Old Man Tessier," who had no children living with him, lived north of her home, "in [her]

- 8 -

backyard." Long recalled that Maria disappeared on the evening of December 3, 1957. She also recalled that sometime "way before" Maria's disappearance, when Long was in grade school, a person named Johnny had given Long piggyback rides. She described Johnny as tall and thin, with "blondish-brown hair" that had a "flip" in it and "strange teeth, something funny about his teeth." On her last piggyback ride with Johnny, her father caught her and "jerked" her off Johnny's back.

¶ 42    At this point in the narrative, we leave the 1950s and go forward to January 1994. Janet testified that Eileen was hospitalized with cancer for two weeks before her death in January 1994. According to Janet, the hospitalization occurred because Eileen was pulling out her IVs and could not be cared for at home. According to Janet, sometime during that hospitalization, when Janet's sister Mary was present, Janet was sitting at the foot of her mother's hospital bed when Eileen said, "Janet." Janet testified that she jumped out of her chair and went close to her mother. According to Janet, Eileen grabbed her wrist and said, "Those two little girls and the one that disappeared, John did it. John did it, and you have to tell someone. You have to tell someone."

¶ 43    According to Janet, she contacted the Sycamore police and the FBI but nothing happened. Then, in 2008, Janet contacted the Illinois State Police and they followed up on her information.

¶ 44    On cross-examination, Janet testified that she was one year old in 1957 and had no recollection of the events surrounding Maria's disappearance. She also agreed that her mother never told her how she claimed to know the information she imparted to Janet in the hospital room and that she did not ask her mother that question. Janet admitted that her mother was "disturbed emotionally" while hospitalized. However, on redirect examination, Janet testified that her mother was coherent when she made the statement. Janet testified that, in her "own opinion," her mother was "lucid" at that point.

¶ 45    Our narrative now jumps to July 27, 2011, when two events occurred: defendant was extradited from Washington to Illinois, and Maria's body was exhumed and re-autopsied. We first detail the evidence at trial relating to the Seattle investigation and the extradition.

¶ 46    Seattle detective Irene Lau interviewed defendant at the Seattle police department on June 29, 2011. She had already been briefed on the reason for defendant's presence in the Seattle police station. Lau testified that when she interviewed defendant he alternated between "rage and calm" and "was pretty angry." According to Lau, when she asked defendant if he had known Maria or her family, he described Maria as being "very stunningly beautiful with big brown eyes." Further, defendant stated that Maria was "lovely, lovely, lovely." He appeared to be discussing Maria "as if he was talking about someone he had been deeply, deeply in love with." Defendant objected to the characterization, and the objection was sustained. Lau then testified that, when defendant made those statements about Maria, "his entire face changed." According to Lau, whereas defendant's body had been "quite rigidly stiff" during questioning, he "had just totally relaxed" when he talked about Maria. On cross-examination, Lau testified that defendant vehemently denied any involvement in Maria's abduction and that he was upset when he was accused of being involved.

¶ 47    Seattle homicide detectives Cloyd Steiger and Michael James Ciesynski accompanied defendant from Seattle to Sycamore on July 27, 2011. According to the detectives, defendant talked the entire time. Steiger described a lot of the conversation with defendant as "chitchatty stuff." However, defendant also discussed matters relevant to Maria's

disappearance. According to Steiger, defendant described Maria as "a beautiful little Barbie doll."

¶ 48    Steiger testified that defendant talked about his whereabouts on the day Maria was abducted. Defendant asked the detectives to note how long it took to get from Chicago to Sycamore. Defendant stated that he had hitched a ride from Chicago to Rockford, because Rockford was close to Sycamore, and that he called his dad from Rockford. When Steiger asked defendant if he made the phone call from the train station in Rockford, defendant responded, "Oh, no, no, no, I never took the train anywhere that day."

¶ 49    According to Steiger, while they were en route to Sycamore from O'Hare Airport, they stopped at a restaurant because defendant was hungry. Ciesynski sat with defendant, and Steiger sat at a nearby table eavesdropping on defendant's conversation. Steiger took notes on a placemat. They left the restaurant and defendant talked some more about the case on the ride to Sycamore. Steiger testified that defendant told them about the car he had in 1957 and how nobody else drove that car. Defendant told Steiger that he last saw Maria when she was five years old, standing near the corner of Center Cross Street and Archie Place. Defendant told Maria to get away from the road.

¶ 50    When they arrived in Sycamore, they drove to the intersection of Center Cross Street and Archie Place. Defendant pointed out his old house. According to Steiger, defendant pointed to a window and said, "That's the window I crawled in that night right there." Defendant said that he had hitchhiked from Rockford to Sycamore when his father could not pick him up in Rockford. Steiger testified that defendant stated that his family was surprised to see him the next morning. When Steiger asked defendant why he crawled through a window, defendant replied that no one was watching and that Sycamore then was "Happy Days."

¶ 51    On cross-examination, Steiger testified that defendant had denied involvement in the crime. On redirect examination, Steiger testified that Ciesynski at one point suggested to defendant the "possibility" that defendant had given Maria piggyback rides on the evening she disappeared but that someone else came along and kidnapped her. According to Steiger, defendant paused for "a couple moments and thought," and then responded, "No, I never gave her a piggyback ride." Then, in response to a question on re-cross-examination, Steiger amended his answer and said that defendant responded, "That didn't occur."

¶ 52    Ciesynski's testimony was similar to Steiger's. Ciesynski testified that defendant told them that he "could not have done it," because he was in Chicago at the time. According to Ciesynski, when defendant called Maria a "beautiful little Barbie doll," defendant was "glowing." Ciesynski wondered aloud whether someone else could have picked Maria up after defendant gave her a piggyback ride and left. According to Ciesynski, defendant "sat back kind of reflectively," then said, "No, didn't happen like that."

¶ 53    We move now to the testimony relating to the other event of July 27, 2011, the exhumation and second autopsy of Maria's body. The State did not introduce a report from the pathologist. The State called Dr. Krista Latham, a forensic anthropologist, as its only witness regarding the 2011 findings.

¶ 54    Dr. Latham was present at the exhumation, and she attended the autopsy. She testified that the pathologist did not cut any of the bones during the autopsy. Following the autopsy, Dr. Latham removed the soft tissue and debris from the bones and then transported the bones to her laboratory in Indianapolis for examination. Through dental records, Dr. Latham established that the skeleton was Maria's.

¶ 55 Dr. Latham described the cuts on the bones from the original 1958 autopsy. She then described three "cutting events" beneath the throat area and in the deep chest region that were not related to the 1958 autopsy and had been inflicted with a blade larger than a scalpel, such as a knife. According to Dr. Latham, these cutting events were also called "sharp force trauma." Dr. Latham testified that the cut marks appeared on the front of the back bones. Dr. Latham could not say whether the "cutting events" occurred at the time of death, although she acknowledged that her report stated that they might have resulted from trauma inflicted at that time. Nor was she able to testify regarding the time of death. Dr. Latham also was unable to recover any "transfer" DNA, due to DNA degradation that occurred because of water in the casket. On cross-examination, Dr. Latham testified that she is not an expert in pathologies of soft tissues and that she does not examine soft tissues. Rather, she examines hard tissues, being bones and teeth. Dr. Latham testified that she did not read the 1958 autopsy report to look for evidence of ligature marks or soft-tissue trauma. Dr. Latham was not asked whether her opinions were rendered within a reasonable degree of scientific certainty.

¶ 56 The State also introduced evidence through Sycamore police detective Daniel Hoffman regarding the proximity of the Apple River to the site where Maria's body was found near Galena. According to Hoffman, the area on the north side of Route 20, where Maria's body was found, is wooded.

¶ 57 The remainder of the State's case centered on statements defendant made to inmates of the De Kalb County jail. The State's first inmate witness was Christopher Diaz, who was incarcerated on a charge of aggravated criminal sexual abuse. Diaz had prior convictions of attempted mob action (reduced from felony mob action) and felony possession of a fraudulent identification card. Diaz denied being a gang member.

¶ 58 Diaz testified that in September 2012 he overheard some conversations between defendant and Diaz's cellmate, known as John Doe at trial. According to Diaz, defendant told Doe that he was giving "the victim" a piggyback ride down an alley and that "the other girl" went inside to grab mittens. Diaz testified that he next overheard defendant say that he "had the victim in his house for quite a while and that his mom knew about it." According to Diaz, the next thing he overheard was defendant describing "how he killed the victim, the little girl, saying he strangled her with [a] wire." Then, according to Diaz, defendant said that he hid the girl. Diaz testified that in another conversation defendant said that he hit the girl on the head but her skull was "intact." According to Diaz, in yet another conversation, defendant stated that in order to "throw people off" he was telling people that he did not have a car, when defendant actually had a car with flames painted on it. Diaz testified that at one point defendant was "mad" at the State's Attorney and wanted to kill him. According to Diaz, at one time the State had offered defendant a deal and defendant said "Fuck that." Diaz testified that defendant thought that the State had no evidence except from his mother, who was dead, and a sister, whom he called a "dumb bitch." Diaz testified that defendant admitted to giving another girl a piggyback ride at his grandfather's house. Defendant asked Diaz and Doe if they could "do anything" to Kirk Swaggerty, who was to be a witness against defendant. Finally, Diaz testified that the State had not offered him anything for his testimony. On cross-examination, Diaz admitted that there was an immigration hold on him and that he could be deported. Diaz denied that he thought his helpful testimony would benefit him; he said that he had contacted the State's Attorney because it was the right thing to do. Diaz also admitted to having pleaded guilty to the charge of being in contact with gang members.

¶ 59    The second inmate witness was John Doe. Doe had been convicted of murder, home invasion, criminal damage to property, and two counts of unlawful possession of a weapon by a felon. According to Doe, between the dates of August 30, 2012, and September 5, 2012, he had many conversations with defendant. Doe testified that after he denied knowing anything about defendant or his case, and after Doe told defendant that he could not do anything about the witnesses who were going to testify against him, defendant "got into details."

¶ 60    Doe testified that defendant said that he first met "the little girl" along with another little girl and that one had to go inside to get her gloves or her "mitts." Defendant said that he gave the other little girl a piggyback ride down an alley behind a building. Defendant fell, and the girl hit her head and started crying or yelling. Doe testified that defendant said that it was an accident but that he did not tell anyone about it because no one would believe him. Doe testified that defendant stated that he crawled through a window into his house and pulled the little girl through the window, where he "had" her inside his bedroom, something his mother knew about. According to Doe, defendant said that he choked the little girl and then later said that he choked her with a wire. Doe testified that defendant told him that he put the little girl in his coupe, drove to Jo Daviess County, and got rid of the body by placing it by some fallen trees. Defendant stated that he lied about not having the car at that time and also lied about it having a flat tire.

¶ 61    Doe testified that, in their next conversation, defendant was angry and giddy, "almost child-like." Doe testified that defendant got "amped up" when he talked about the little girl. According to Doe, at another time defendant said that most "serious" criminals "like murderers" can draw, and then defendant said about himself and Doe, "We can both draw." In still another conversation, according to Doe, defendant said that he had called the FBI with a false story, trying to lead them in the wrong direction. On cross-examination, Doe denied that he had been promised anything for his testimony, but he admitted that he had a pending petition asking for a reduction in his sentence.

¶ 62    Swaggerty was the last inmate witness. He had been convicted of murder and possession of a weapon by a felon in 2011. Swaggerty testified that the "whole jail" was talking about defendant, who was on the news and was being extradited to Illinois. According to Swaggerty, defendant introduced himself as the man in the news and then "just began talking."

¶ 63    Swaggerty testified that he asked defendant if he was going to "take a plea," and that defendant replied that he could probably get probation because "it was an accident." According to Swaggerty, defendant said that he was giving the little girl a piggyback ride when she fell. Defendant stated that she would not stop screaming and that she accidentally suffocated while defendant was trying to keep her quiet. Defendant said that he had at one time called the FBI with a story about a dream in which a "guy named 'Johnny' did this" to the girl. According to Swaggerty, defendant then admitted that he was "Johnny."

¶ 64    Swaggerty also testified that defendant told him details about the investigation in Seattle, specifically that defendant's wife opened the house safe for the police. Swaggerty recalled that defendant started to "stare off" during another conversation and then said, "She was a very pretty girl," which Swaggerty found "creepy." According to Swaggerty, defendant's demeanor was "normal" until he started to talk about the little girl. On cross-examination, Swaggerty admitted that in a petition to reconsider his sentence he cited his cooperation in

the case against defendant as a basis for leniency. Swaggerty also admitted that he wrote letters to the authorities offering testimony against other defendants. On redirect examination, Swaggerty testified that defendant stated that the State did not have DNA but that, "if they find some," he would talk about a plea bargain.

¶ 65    The State's last witness placed the inmate witnesses and defendant in the jail at the times of the conversations testified to, and the State rested. Defendant moved for a directed finding, which was denied.

¶ 66    Defendant's first witness was a jail employee who testified that, according to jail records, Diaz was a member of the Ambrose street gang.

¶ 67    Next, defendant's half-sister Mary Hunt testified for defendant. She was present in Eileen's hospital room when Eileen made the statement regarding defendant to which Janet testified. According to Mary, Eileen was "basically comatose." Mary heard Eileen say only, "He did it," without saying who "he" was or what "it" was. Eileen did not answer Mary's follow-up questions. On cross-examination, Mary admitted that Eileen had lucid periods during her hospitalization.

¶ 68    Defendant's last witness was Dr. John Prabhakar, the surgeon who had implanted an IV in Eileen's neck for the administration of morphine during her January 1994 hospitalization. Dr. Prabhakar testified that morphine causes confusion, and the doctor noted in Eileen's chart that she was "pleasantly confused." He also noted that she was "disoriented." The records showed that Eileen was also on Haldol, which the doctor testified could cause confusion. The doctor noted that there was a diagnosis of "unspecified psychosis" in the medical record. On cross-examination, Dr. Prabhakar testified that he had spent a total of about 30 minutes with Eileen when he inserted the IV and that he could not testify to what she was like on other occasions. Defendant then rested, and the State presented no rebuttal.

¶ 69    In ruling, the trial court found all of the witnesses credible. The court found the inmate witnesses credible even though it found that they were "all bad guys," that they "all belong in prison," and that "they all hope to benefit from their testimony." The court found that the State had not offered them anything in exchange for their testimony. The court further found that, while there was no proof of cause of death in the record, it would draw the inference that stabbing was the cause of death. The court found Chapman's eyewitness identification "most convincing." The court found that some witnesses' memories had dimmed with time but that this was "to be expected after these many years." Based on the totality of the evidence, the court found defendant guilty on all three counts of the indictment. Under the 1957 statutes, the court sentenced defendant to natural life in the Illinois Department of Corrections on count I, murder; to five years' incarceration on count II, kidnapping; and to seven years' incarceration on count III, abduction of an infant. The court ordered that the sentences for kidnapping and abduction of an infant "merge" with the sentence for murder. Defendant filed a timely appeal.

¶ 70                                II. ANALYSIS
¶ 71            A. Whether Defendant Was Proved Guilty Beyond a Reasonable Doubt
¶ 72    Defendant first contends that he was not proved guilty beyond a reasonable doubt. He argues that Chapman's eyewitness identification 53 years after the crime was not credible and that none of the other witnesses with recollections from the 1950s offered any probative

evidence of defendant's guilt. Defendant argues that the inmate witnesses were incredible due to their motivations to lie, their accounts' internal inconsistencies, the inconsistencies between their accounts and the physical evidence, and their exposure to the publicity about the case.

¶ 73    In evaluating the sufficiency of the evidence, we do not retry the case. *People v. Milka*, 336 Ill. App. 3d 206, 227 (2003). We do not ask ourselves whether we believe that the evidence at trial established guilt beyond a reasonable doubt. *People v. Holmes*, 141 Ill. 2d 204, 239 (1990). Rather, the proper inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Holmes*, 141 Ill. 2d at 239.

¶ 74    In a bench trial, the judge determines the credibility of witnesses and the weight to be given to the witnesses' testimony, and the judge draws reasonable inferences from the evidence. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A conviction may be sustained only if the evidence sufficed to show that the defendant committed the crime. *Milka*, 336 Ill. App. 3d at 227. In making such inquiry, it is improper to segregate each piece of evidence in a circumstantial case and try to locate the doubt therein. *Milka*, 336 Ill. App. 3d at 229. To the contrary, the evidence is sufficient if all of it, taken together, satisfied the trier of fact that the defendant is guilty beyond a reasonable doubt. *Milka*, 336 Ill. App. 3d at 229. Further, the court is not bound to search out all possible explanations consistent with innocence or be convinced beyond a reasonable doubt as to each link in the chain. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). Proof beyond a reasonable doubt does not mandate the exclusion of every possible doubt. *People v. Slinkard*, 362 Ill. App. 3d 855, 858 (2006).

¶ 75    Here, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the following facts: (1) Maria met her death by criminal means; (2) Maria was abducted from the corner of Center Cross Street and Archie Place shortly after 6 p.m. on December 3, 1957, by "Johnny"; (3) defendant was "Johnny"; and (4) defendant killed Maria and disposed of her body in Jo Daviess County.

¶ 76    The State must prove the *corpus delicti* by competent evidence beyond a reasonable doubt. *People v. Jones*, 22 Ill. 2d 592, 596 (1961). In a murder case, the *corpus delicti* consists of the fact of death and the fact that death was caused by the criminal agency of some person. *Jones*, 22 Ill. 2d at 595. The *corpus delicti* can be established by direct or circumstantial evidence. *Jones*, 22 Ill. 2d at 596. That Maria died is a certainty. The first autopsy established through dental records that the body found in the timber in Jo Daviess County was Maria's. In 2011, Dr. Latham reestablished through dental records that the exhumed body was Maria's. The record contains no cause of death. Dr. Latham could not say whether the cutting events she found occurred at the time of death. The most she could say was that the cutting events might have resulted from trauma inflicted at the time of death. Dr. Latham did not so opine within a reasonable degree of scientific certainty. Nevertheless, the court found that stabbing was the cause of death. While the inference that stabbing was the cause of death was not supported by the evidence, the evidence had to establish only that Maria met her death by a criminal agency. See *Jones*, 22 Ill. 2d at 596 (the question is not the method of proving cause of death but whether the fact that death was caused by a criminal agency has been proved beyond a reasonable doubt). Given that Maria was only seven years old and that her body was found far from home four months after her disappearance,

concealed deep among the timber and posed unnaturally, and given that she was badly decomposed and ravaged by small animals, a rational trier of fact could infer that she met her death by a criminal agency. Accordingly, the *corpus delicti* was proved beyond a reasonable doubt.

¶ 77    A second reasonable conclusion that the trial court could have drawn was that "Johnny" abducted Maria. Maria was last seen shortly after 6 p.m. on December 3, 1957, at the corner of Center Cross Street and Archie Place. Chapman testified that "Johnny" approached them at 6 p.m., he gave Maria a piggyback ride, and Maria ran home, three doors away, and ran back to the corner with her doll. Then Chapman went home for her mittens, leaving Maria in Johnny's company. In the short interval between when Chapman went home, which was also nearby, and when she returned to the corner, Maria had vanished. There was traffic on Center Cross Street, but only "Johnny" had been on the corner with Maria when Chapman last saw her. Thus, the central question of the trial was the identification of "Johnny."

¶ 78    The State must prove beyond a reasonable doubt the identity of the person who committed the charged offense. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). Chapman described "Johnny" as having a slender face, with a flip in the side of his hair and large teeth, and weighing 150 pounds. Chapman said that "Johnny" was an older person, but she was eight and considered someone twice her age to be "older." Chapman described the sweater that "Johnny" wore as having a lot of colors in it. In 2010, Chapman identified defendant as "Johnny."

¶ 79    While Chapman was the only eyewitness, the State's case did not rest solely on her identification of defendant. Long's description of "Johnny" was similar to Chapman's. Long testified that "Johnny" was tall and thin, had blondish-brown hair with a flip in it, and had strange teeth. Caulfield described defendant in 1957 as just under 6 feet tall, kind of gangly, with wavy hair. Caulfield said that defendant frequently wore a multicolored sweater. Twadell described defendant in the 1950s as 6 feet tall, 150 to 160 pounds, with sandy blond hair. Twadell also recalled that defendant wore multicolored sweaters.

¶ 80    A single eyewitness's identification of the accused is sufficient to sustain a conviction if the eyewitness viewed the accused under conditions permitting a positive identification. *Lewis*, 165 Ill. 2d at 356. Our supreme court in *Lewis* relied on the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), for assessing identification testimony. *Lewis*, 165 Ill. 2d at 356. Those factors include: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification. *Lewis*, 165 Ill. 2d at 356.

¶ 81    Chapman and Charles testified that the corner of Center Cross Street and Archie Place was well lit by a streetlight. Chapman saw Johnny as he walked up to them from the south and spoke to them. She watched Johnny give Maria a piggyback ride down the street and then come back to the corner. She stood with Johnny, observing him under the streetlight, while Maria went home to get her doll. She had an adequate opportunity to view Johnny, so the first factor weighs in the State's favor. Chapman also paid attention to Johnny, making the second factor weigh in the State's favor. The third factor, the accuracy of Chapman's prior description, also weighs in the State's favor. Chapman described the man as having a slender face, a flip in the side of his hair, and large teeth. The photograph of defendant that

she identified as "Johnny" shows a teenager with a slender face, curly or wavy hair, and large teeth. The fourth factor, the witness's level of certainty, also weighs in the State's favor. Hanley showed Chapman the photographs, which were all similar, by laying them down one-by-one, individually, on her coffee table. Chapman gradually eliminated all but defendant's picture. She told Hanley, "That is him." After Maria's disappearance, the police and the FBI for weeks and months showed Chapman thousands of mug shots and took her to lineups. Yet, she said, she was never shown a picture of Johnny until Hanley showed her defendant's photo. The fifth factor, however, the length of time between the crime and the identification, weighs in defendant's favor.

¶ 82    In our research, we did not find a case resembling the span of time that we have here between the observation and the identification. Defendant cites *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388, 396 (5th Cir. 1961), where, in a completely different context, the court assumed that a witness would not recall the details of a fire 58 years later. We are not permitted to make such an assumption, because our supreme court has held that the lapse of time goes to the weight of the testimony, which is for the trier of fact to determine, and does not destroy the witness's credibility. *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972). Chapman not only had the ability to observe defendant on December 3, 1957, she had an excellent reason to remember him for all the years afterward. She was a witness to an event that horrified the community and caused her to be the object of law enforcement and news media attention (a newspaper photo of her in her mittens is in evidence). For a time the police even accompanied her to Sunday school, making their presence in her life onerous. As we discussed above, her identification was sufficiently corroborated. Defendant attempts to cast doubt on Chapman's credibility now by arguing that People's exhibit No. 80, a photograph, which appears to be a newspaper photo taken in the 1950s, of the corner of Center Cross Street and Archie Place, does not show a streetlight. Chapman was not impeached on that point at trial, and we cannot tell from the photograph whether there is a streetlight. However, Charles corroborated Chapman's testimony that the corner was well lit.

¶ 83    In assessing Chapman's testimony, defendant relies on *People v. Williams*, 383 Ill. App. 3d 596 (2008). However, in *Williams*, the evidence "rested solely on the hesitant testimony of two minors" who were substantially prodded "through vigorous leading questions" and whose testimony was riddled with "internal inconsistencies and self-contradictions." *Williams*, 383 Ill. App. 3d at 638. To the contrary, Chapman was an adult when she testified, her testimony was clear, not hesitant, the State did not have to prod or lead her, and her testimony was not internally inconsistent or self-contradictory. Nor did her testimony conflict with that of other witnesses. We discussed above how remarkably similar her description of defendant was to those given by Long, Twadell, and Caulfield. For the same reasons, defendant's reliance on *People v. Broome*, 130 Ill. App. 2d 227 (1970), is misplaced. In *Broome*, a 15-year-old eyewitness's testimony was found wanting where the identification occurred in the dark, in pouring rain, and when the eyewitness was not wearing his eyeglasses. *Broome*, 130 Ill. App. 2d at 228-29.

¶ 84    Defendant maintains that the other witnesses from the 1950s added nothing to the State's case. We disagree. The people close to defendant expected him to be around on the night Maria disappeared but could not account for his whereabouts that night. Crain expected defendant to drive her home that night after she and Edwards finished decorating Edwards' father's hobby shop, yet she neither saw nor heard from him. Twadell called defendant as

soon as he heard that Maria was missing, but defendant was not at home. Jeanne and Caulfield testified that defendant did not come home that night. They did not see him the next morning either.

¶ 85    Other things were missing. Caulfield testified that, after Maria disappeared, Caulfield never again saw the multicolored sweater that defendant had frequently worn. She also testified that defendant's coupe was not at the home that night. The coupe's absence was significant in light of Twadell's testimony that defendant never allowed anyone else to drive it. A rational trier of fact could infer that defendant was somewhere unknown to anyone close to him and that he was in possession of his coupe that night. That inference takes on significance in light of Caulfield's testimony that defendant was familiar with the area where Maria's body was found.

¶ 86    Defendant does not even discuss the Seattle detectives' testimony, much less question their credibility. Yet, defendant made crucial statements to Steiger and Ciesynski regarding his whereabouts on the day and night of Maria's disappearance. Defendant said that he hitchhiked from Chicago to Rockford and then hitchhiked from Rockford to Sycamore. He told Steiger that he crawled through a window into his house and surprised his family the next morning. When Steiger asked why he climbed through a window, defendant did not answer the question but said that no one was looking and that Sycamore was "Happy Days." The trial judge could have found defendant's version of his whereabouts incredible, especially in light of Jeanne's and Caulfield's testimony that they did not see him the next morning. Further, when defendant told Steiger that he never allowed anyone else to drive his coupe, defendant corroborated Twadell's testimony. The significance of this admission becomes apparent in light of Caulfield's testimony that defendant's coupe was not at the home on the night Maria disappeared. If defendant was driving the coupe, he was not hitchhiking. A false exculpatory statement is probative of consciousness of guilt. *People v. Milka*, 211 Ill. 2d 150, 181 (2004) (the defendant lied to the police about his whereabouts during the critical time periods); *People v. Hommerson*, 399 Ill. App. 3d 405, 410 (2010) (the defendant's whereabouts were critical, yet he never gave the police a consistent explanation of them).

¶ 87    Defendant made the most damaging statement to Ciesynski. Ciesynski suggested to defendant that after defendant gave Maria a piggyback ride someone else might have come along and taken her, to which defendant replied after some reflection, "No, didn't happen that way." Defendant's statement could be construed to mean that he was not present at the scene or did not give Maria a piggyback ride. Or it could be construed to mean that defendant was present at the scene and knew exactly what happened.

¶ 88    Defendant argues that the jail inmates' testimony was unworthy of belief. Yet, after acknowledging that they all were "bad" people, criminals who deserved to be in prison and who hoped for leniency, the trial court found them credible. "[I]t is quite established that the credibility of a government informant, as with any other witness," is a question for the trier of fact. *People v. Manning*, 182 Ill. 2d 193, 210 (1998).

¶ 89    Defendant posits that "so much" of what the inmates said "was based on what was already public knowledge." This statement is not borne out by the record. Swaggerty testified that the whole jail was talking about the man who, according to the news, was being extradited to De Kalb County, but Swaggerty did not testify to what, if any, details of the crime the inmates learned from the news. Swaggerty testified only that it was "obvious" that

defendant was charged with a 50-year-old murder. Then, said Swaggerty, defendant "just began talking." The first time defendant met Doe, he asked Doe if he had heard of him or seen anything on TV. Doe answered no. Defendant asked Doe if he knew about a 1956 or 1957 murder of which defendant was accused, and Doe said no. Diaz did not indicate that he had any preexisting knowledge of the crime.

¶ 90        Defendant argues that the inmates' testimony concerning the manner of death conflicted with Dr. Latham's testimony. Diaz overheard defendant say that he strangled Maria with a wire. Defendant told Doe that Maria hit her head when defendant slipped and fell during a piggyback ride, that defendant pulled Maria inside his house through a window, and that he "had" her inside "the bedroom," after which he choked her with a wire. Swaggerty testified that defendant told him that Maria accidentally suffocated after she fell during a piggyback ride and would not stop screaming.

¶ 91        The evidence does not show how Maria died. At the first autopsy Dr. Truemner said that he could not opine on the cause of death, because of the advanced state of decomposition and the ravages from small animals. Dr. Truemner could not tell whether the hyoid bone or the larynx was fractured. Dr. Truemner did not find any form of "obvious, gross, mechanical trauma." He did not find three stab wounds.

¶ 92        While Dr. Latham found "sharp force trauma," neither autopsy ruled out ligature strangulation, because Dr. Latham, as a forensic anthropologist, did not examine the soft tissues of the neck area, and Dr. Truemner stated that dissection of them was virtually impossible due to the effects of decomposition. Thus, nothing in the forensic evidence is inconsistent with the inmates' testimony regarding defendant's statements. Defendant argues that the forensic evidence does not show a skull injury and thus contradicts Diaz's testimony that defendant said that he hit Maria on the head. However, Diaz also heard defendant say that Maria's "skull was intact" after the blow, an interesting choice of words since Dr. Truemner had stated that the skull was "intact," a fact that Diaz would not know unless defendant had discussed the matter in front of Diaz.

¶ 93        We recognize that defendant gave Doe and Swaggerty slightly different versions of how he killed Maria. However, the variances are not such that they raise a reasonable doubt of defendant's guilt, because none of the versions was impossible under the evidence, as was the case in *People v. Lindsey*, 73 Ill. App. 3d 436 (1979). In *Lindsey*, the court reversed the defendant's murder conviction where the defendant had confessed to "rapes of two girls later found to be virgins; a stabbing of which there was no supporting evidence; strangulation by rope of which there was no evidence; arson by use of an accelerant for which there was no supporting testimony; and aggravated assault on parts of a body which bore equivocal evidence of such an injury." *Lindsey*, 73 Ill. App. 3d at 448. In *Lindsey*, the court declared that the prosecution's evidence taxed "even the gullibility of the credulous." (Internal quotation marks omitted.) *Lindsey*, 73 Ill. App. 3d at 448. That was not the case here. Dr. Truemner in 1958 could not dissect the soft tissues of the neck, so he did not opine with respect to any injuries or lack thereof in that area. Dr. Latham is a forensic anthropologist. She examined the bones. She specifically testified that she did not examine the soft tissues of the neck. Thus, the evidence does not contradict the testimony that defendant stated that he strangled Maria with a wire.

¶ 94        Furthermore, the inmates testified to details that were too obscure to mean anything to them unless defendant had related them to the inmates in context. Swaggerty knew that

defendant's wife opened their home safe when the police executed the search warrant in Seattle, something only defendant could have told him. Diaz overheard defendant tell Doe that to throw people off he told people that he did not have a car, when in actuality he had a car with flames painted on it. Defendant told Doe how he had deceived people by saying that his car had been disabled, when in reality he had used the car to transport Maria's body to Jo Daviess County. Defendant told Doe and Swaggerty that he had deliberately misled the FBI by planting false stories. Attempts to deflect the investigation prove consciousness of guilt. *People v. Ehlert*, 211 Ill. 2d 192, 240 (2004).

¶ 95    Evidence of threats to intimidate or kill witnesses is also proof of consciousness of guilt. *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 21. Defendant asked Diaz and Doe if they could "do anything about" the witnesses who were going to testify against him, and defendant specifically named Swaggerty. Diaz also said that defendant was "mad" at the State's Attorney and wanted to kill him.

¶ 96    Further, Swaggerty knew that defendant used to go by the name "Johnny" and Diaz knew that defendant gave another little girl a piggyback ride at his grandfather's house. That defendant was the "Johnny" who gave Long a piggyback ride near "Old Man Tessier's" house in Long's backyard is something that only defendant could have told the inmates.

¶ 97    Defendant claims that it is incredible that a man would identify himself before committing a serious crime. However, the evidence showed that defendant singled out very young girls. It happened that one of them remembered him for the rest of her life. Defendant cites *People v. Dawson*, 22 Ill. 2d 260 (1961), but that case is inapposite. In *Dawson*, our supreme court found it incredible that the defendant, a police officer and a person of good character and reputation, would commit an armed robbery after identifying himself in an office where he was well known. *Dawson*, 22 Ill. 2d at 265. Our supreme court said that this was especially so where the defendant made no attempt to flee the scene. *Dawson*, 22 Ill. 2d at 265. In our case, Chapman did not know defendant. The evidence showed that defendant was much older than Maria and that he had not played with her. The evidence also showed that Maria and Chapman attended public school, whereas the Tessier children attended parochial school. Defendant risked nothing by introducing himself as "Johnny" in an effort to ingratiate himself with two very young grade schoolers. Further, defendant might not have planned the crime at the time he introduced himself.

¶ 98    Defendant argues that the prosecution failed to exclude the possibility that the man who gave Maria a piggyback ride left the area and then someone else came by the scene and abducted her. He cites *People v. Holsapple*, 30 Ill. App. 3d 976 (1975), for the proposition that the State must exclude the possibility that someone else committed the crime. However, *Holsapple* used the reasonable-hypothesis-of-innocence standard of review. *Holsapple*, 30 Ill. App. 3d at 990 ("In order to sustain the conviction, the evidence must exclude any reasonable hypothesis of innocence."). This standard of review was rejected by our supreme court in *People v. Pintos*, 133 Ill. 2d 286, 291 (1989). In *Pintos*, our supreme court held that "the reasonable hypothesis of innocence standard of review is no longer viable in Illinois. Instead, we find that the reasonable doubt test as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261, should be applied in reviewing the sufficiency of the evidence in all criminal cases, whether the evidence is direct or circumstantial." *Pintos*, 133 Ill. 2d at 291. In *Collins*, our supreme court, following *Jackson*, 443 U.S. at 319, held that the "relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *Collins*, 106 Ill. 2d at 261. Consequently, the State did not have to exclude the possibility that someone else could have appeared on the scene and abducted Maria. At oral argument, defendant agreed that *Collins* sets forth the correct standard of review.

¶ 99   Defendant contends that all of the evidence permits only the conclusion that he had the opportunity to commit the crime, as did others. Defendant cites *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991). However, in *Dowaliby*, the court named another person who had the opportunity to commit the murder. *Dowaliby*, 221 Ill. App. 3d at 798. Here, defendant names no one else. Also, in *Dowaliby*, the State's only evidence was of opportunity and an identification of the defendant's nose structure and car. *Dowaliby*, 221 Ill. App. 3d at 797. Here, Chapman identified defendant's entire face, and her description of defendant was consistent with defendant's appearance in 1957 and with Long's description of "Johnny." While the evidence showed that there were cars traveling on Center Cross Street at 6 p.m. on December 3, 1957, the evidence also showed that no one was present at the corner except defendant and the two little girls.

¶ 100   Finally, defendant relies on *People v. Rivera*, 2011 IL App (2d) 091060, in which this court reversed the defendant's murder conviction. *Rivera* is distinguishable. In *Rivera*, the physical evidence recovered from the scene was not matched to the defendant. *Rivera*, 2011 IL App (2d) 091060, ¶ 29. Perhaps most important, DNA determined conclusively that the defendant was not the source of the sperm found inside the victim. *Rivera*, 2011 IL App (2d) 091060, ¶ 30. Against all of this exculpatory evidence, we said that the testimony of the jailhouse informants was incredible. *Rivera*, 2011 IL App (2d) 091060, ¶ 39. Here, as we discussed above, the forensic evidence did not tend to exonerate defendant. In *Rivera*, the jailhouse informants had testified only that the defendant had admitted that he committed the murder, without further details. *Rivera*, 2011 IL App (2d) 091060, ¶ 14. In stark contrast, the inmate witnesses in our case divulged a wealth of minutiae that could have come only from defendant–that defendant used a 1948 coupe with flames painted on it to transport Maria's body; that defendant gave another little girl piggyback rides at his grandfather's house; that defendant lied about whether he had a car at the time of Maria's disappearance; that defendant's wife opened the safe during the execution of the search warrant in Seattle; and that defendant planted false stories with the FBI. In *Rivera*, we said that jailhouse informants' testimony should be treated with caution. *Rivera*, 2011 IL App (2d) 091060, ¶ 36. Here, the trial court followed that admonition but still found the inmates' testimony credible. Their credibility was for the trier of fact to determine and could be the basis for a finding of guilt. *Rivera*, 2011 IL App (2d) 091060, ¶ 36. Furthermore, our supreme court recently affirmed that the testimony of jailhouse informants is not to be viewed as inherently unbelievable. *People v. Belknap*, 2014 IL 117094, ¶ 55.

¶ 101   Having examined the evidence in the light most favorable to the State, as we are required to do, we conclude that the evidence was sufficient for *any* rational trier of fact to find that all of the essential elements of the crimes were proved beyond a reasonable doubt.

¶ 102　　　　　　B. Whether Defendant Was Deprived of the Right to Present a Defense

¶ 103　　Defendant next argues that the trial court erred in excluding certain FBI reports and Solar's testimony indicating that at one time the police had another suspect. Defendant contends that the exclusion of this evidence deprived him of his right to present a defense.

¶ 104　　A criminal defendant has a right to a meaningful opportunity to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006). The United States Supreme Court has held that this right is violated by state evidentiary rules that infringe upon a "weighty interest of the accused" and are "arbitrary or disproportionate to the purposes they are designed to serve." (Internal quotation marks omitted.) *Holmes*, 547 U.S. at 324. While the Constitution prohibits the exclusion of defense evidence under rules "that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," other, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Holmes*, 547 U.S. at 326. It is, of course, within the trial court's discretion to determine whether evidence is admissible, and the court's decision will not be reversed absent an abuse of discretion. *People v. Garcia*, 2012 IL App (2d) 100656, ¶ 17. A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the trial court's view. *Garcia*, 2012 IL App (2d) 100656, ¶ 17.

¶ 105　　　　　　　　　　　　1. The FBI Reports

¶ 106　　We first consider the admissibility of the FBI reports. Defendant posits that, due to the passage of so much time, crucial witnesses and documents that established his alibi had disappeared, making the introduction of the FBI reports appropriate, even necessary, in a search for the truth. Defendant maintains that the FBI reports place him in Rockford when Maria was abducted. Defendant sought to introduce the FBI reports on two grounds: that they are ancient documents and that they are public records. It is incumbent upon the party offering hearsay to establish that it meets the requirements of an exception. *Garcia*, 2012 IL App (2d) 100656, ¶ 20.

¶ 107　　Illinois Rule of Evidence 803(16) (eff. Jan. 1, 2011) provides that statements in a document in existence 20 years or more, the authenticity of which is established, are not excluded by the hearsay rule. At the hearing on defendant's motion to admit the FBI reports, the State conceded the documents' authenticity, and it is not disputed that the documents have been in existence more than 20 years. We have found no Illinois case that governs this issue, although the State relies on cases holding that police reports are inadmissible as substantive evidence because they are generated in anticipation of litigation and thus lack trustworthiness and reliability. See *People v. Ullrich*, 328 Ill. App. 3d 811, 820 (2002). However, cases such as *Ullrich* and *People v. Smith*, 141 Ill. 2d 40, 72 (1990), in which our supreme court held that records relating to a police investigation are generally excluded from the business-records exception to the hearsay rule, do not address admissibility under Rule 803(16). Another reason police reports are generally excluded as substantive evidence relates to serious confrontation-clause and cross-examination concerns. *Ullrich*, 328 Ill. App. 3d at 820.

¶ 108　　The Illinois Rules of Evidence largely track the Federal Rules of Evidence. *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 33. Thus, it is appropriate to look

to federal cases for guidance. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 357 (2008). In *Hicks v. Charles Pfizer & Co.*, 466 F. Supp. 2d 799, 806 (E.D. Tex. 2005), the court held that, if the author of an ancient document had personal knowledge of the substance underlying the assertive statements, the document is admissible under the ancient-document exception to the hearsay rule. In *Hicks*, the court identified the "crucial issue" as whether Federal Rule of Evidence 803(16), which is identical to the Illinois rule, inoculates all assertive statements contained within ancient documents, including double hearsay. *Hicks*, 466 F. Supp. 2d at 806. The court indicated that courts are split on the issue. *Hicks*, 466 F. Supp. 2d at 806. Some courts require that a separate hearsay exception must apply to each layer of hearsay contained within the ancient document, while other courts imply that multiple layers of otherwise inadmissible hearsay may be admitted under Rule 803(16). *Hicks*, 466 F. Supp. 2d at 806.

¶ 109     The FBI reports at issue here present the problem of multiple hearsay. The reports were authored by FBI agents who had no personal knowledge of the substance of the underlying assertions. The reports relate what Oswald reported that defendant told Oswald; what Oswald related that Liberwitz and Froom told Oswald; what Eileen and Ralph told the agents; and what the general manager of the telephone company said his records showed. Generally, "the risk of deception or mistake is compounded with each additional layer of hearsay." *Hicks*, 466 F. Supp. 2d at 806. The risk of deception is further compounded when we consider that defendant was the source of the first part of the "alibi," the train trip that defendant told Oswald he took from Chicago to Rockford, and that defendant's parents were the source of the second part of defendant's "alibi," the 7:10 p.m. collect call and Ralph's picking defendant up in Rockford. One of the underpinnings of the ancient-document exception to the hearsay rule is that an assertive statement found in an ancient document is more likely to be truthful because it was written before the current motive to fabricate arose. *Hicks*, 466 F. Supp. 2d at 805. However, defendant and his parents had a motive to fabricate when they gave their alibi statements in 1957. If, when the document was written, a motive for misrepresentation already existed, the document can be excluded under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) as unfairly prejudicial. See *Ultratec, Inc. v. Sorenson Communications, Inc.*, No. 13-cv-346-bbc, 2014 WL 4829173, at \*7 (W.D. Wis. Sept. 29, 2014) (document that otherwise qualifies as an ancient document may be excluded under Rule 403 where a motive for misrepresentation existed when the document was written).

¶ 110     We agree with *Hicks* that the better view is that each layer of hearsay contained in an ancient document must be excused by its own hearsay exception. This is the view adopted by our own Seventh Circuit in *United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998) (the admissibility exception applies only to the document itself; if a document contains more than one level of hearsay, an appropriate exception must be found for each level). The court in *Hajda* found this to be consistent with Federal Rule of Evidence 805, which provides that hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms to an exception. Illinois Rule of Evidence 805 (eff. Jan. 1, 2011) is identical. If we were to read Rule 803(16) as inoculating multiple levels of hearsay, Rule 805 would be superfluous. See *Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 333, 338 (2003). In other words, ordinarily Rule 803(16) applies only where the declarant is the author of the ancient document. *Columbia*, 58 Fed. Cl. at 338.

¶ 111      For this reason, we reject defendant's reliance on *Dallas County*, 286 F.2d at 390-91, where the court admitted a 58-year-old newspaper article about a fire, and his reliance on *State v. Sargent*, 710 N.E.2d 1170 (Ohio Ct. App. 1998), where police reports were admitted as ancient documents. In *Dallas County*, the newspaper article was admitted to show that the Dallas County courthouse in Selma, Alabama, was damaged by fire in 1901. Aside from any double hearsay, the character of the matter sought to be proved by the newspaper article–that the courthouse was damaged by fire–is not susceptible to the pitfalls of recent fabrication. Contrariwise, the "alibi" contained in the FBI reports depends almost entirely on defendant's own account of his actions and the accounts given by his parents.

¶ 112      In *Sargent*, in a hearing to determine whether the defendant was a repeat violent offender under Ohio law, the trial court admitted out-of-state police reports under the ancient-document exception to the hearsay rule. *Sargent*, 710 N.E.2d at 1175. Contrary to our holding today that each layer of hearsay must be excused by its own exception, the court in *Sargent* imposed no such requirement. In our view, satisfying the mere procedural requirements of the exception does not ensure trustworthiness or reliability. For this reason, we believe that the approach the court took in *Sargent* is unworkable. "The dangers of hearsay relate to flaws in perception, memory, narration, and sincerity." *Rehm v. Ford Motor Co.*, 365 S.W.3d 570, 581 (Ky. Ct. App. 2011) (Caperton, J., concurring in part and dissenting in part). Moreover, we agree that the ancient-document exception is "not a wide open door but a narrow crevice." *Rehm*, 365 S.W.3d at 579 (Caperton, J., concurring in part and dissenting in part). Consequently, the FBI reports were not admissible under Rule 803(16).

¶ 113      We next consider whether the FBI reports were admissible as public documents under Illinois Rule of Evidence 803(8) (eff. Jan. 1, 2011), which permits, as a hearsay exception, the admission of records, reports, statements, or data compilations, in any form, of a public office or agency as to the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report. Defendant concedes that the second part of Rule 803(8) excludes police reports. Nevertheless, linking the admission of the FBI reports to his right to call witnesses in his defense, he argues that the purpose of the exclusion, the protection of a defendant's rights of confrontation and cross-examination, disappears when the defendant seeks their admission. The dangers and weaknesses of the multiple hearsay contained in the FBI reports were detailed above. Shifting the ground upon which admissibility is urged does not erase the inherent flaws. Multiple hearsay remains multiple hearsay, and it is not admissible under Rule 805 unless each layer of hearsay is excused by its own exception. Defendant cites no case holding that the right to call witnesses includes the right to present multiple hearsay.

¶ 114      We conclude that the exclusion of the FBI reports did not violate defendant's right to present a defense, for two reasons: (1) the rule of evidence prohibiting their admission is not arbitrary, and (2) even if the FBI reports had been admitted, they do not tend to exonerate defendant. *Holmes* held that the Constitution prohibits the "exclusion of defense evidence under rules that serve no legitimate purpose." *Holmes*, 547 U.S. at 326. The rule against hearsay is grounded in the necessity of cross-examination, and it is a basic rather than a technical rule. *Grand Liquor Co. v. Department of Revenue*, 67 Ill. 2d 195, 199 (1977). Allowing rank hearsay or multiple hearsay, without any means of testing its veracity through cross-examination, would lead to the unfair prejudice, confusion of the issues, and potential

to mislead that *Holmes* identified as legitimate reasons to exclude evidence. At the heart of this issue is defendant's desire to present an alibi defense without allowing the State the opportunity for cross-examination. That desire is understandable, given that his 1957 "alibi" could have been impeached by statements he made in 2011, as we discuss below.

¶ 115    Further, the FBI reports do not tend to support an alibi defense, because they are inconsistent and inconclusive. A defendant presents an alibi when he presents competent evidence that he was at a specified place other than the crime scene at the time of the offense. *People v. Colts*, 269 Ill. App. 3d 679, 691 (1993). A defendant who attempts to prove an alibi must cover the actual and exact time that the crime was committed. *Garrity v. People*, 107 Ill. 162, 163 (1883). The defendant must account for his whereabouts for the time during which the act could have been consummated. *People v. Van Dyke*, 414 Ill. 251, 256 (1953). Chapman testified that defendant approached her and Maria at the corner of Center Cross Street and Archie Place in Sycamore at 6 p.m.

¶ 116    In 1957, defendant told Oswald that he was on a train from Chicago to Rockford at 6 p.m., arriving at 6:45 p.m. Oswald repeated defendant's story to the FBI, but neither Oswald nor the FBI confirmed it. Indeed, Oswald stated that, although he learned that the Army Reserve unit on Van Buren Street in Chicago had issued the train ticket, "no verification of the information could be obtained at the time of calling," and Oswald stated that it was highly irregular that such a ticket would have been issued. Thus, the story of the train ticket is confusing, and it is less than clear whether defendant was even issued a ticket. Consequently, the FBI report does not cover defendant's whereabouts at 6 p.m. More important, in 2011, defendant himself debunked the story that he was on a train. Steiger asked defendant if he called home that evening from the Rockford train station. Defendant replied, "Oh, no, no, no, I never took the train anywhere that day."

¶ 117    Oswald related to the FBI that defendant "apparently proceeded" from the train station to the post office in Rockford, where he "personally contacted" Liberwitz. However, that contact was made, according to Oswald, at 7:15 or 7:30 p.m., well after Maria's abduction, because shortly after 7 p.m. Caulfield saw police cars at the corner of Center Cross Street and Archie Place in Sycamore. Defendant's meeting with Froom would have occurred even later than 7:15 or 7:30 p.m.

¶ 118    Similarly, the telephone calls that Ralph and Eileen reported receiving at 7:10 p.m. occurred significantly after Maria's abduction. Further, the FBI report detailing Eileen's statement in which she reported that Ralph picked defendant up in Rockford was contradicted by defendant himself when, in 2011, he told Steiger that he hitchhiked from Chicago to Rockford and then hitchhiked from Rockford to Sycamore and climbed into his house, unnoticed, through a window. Defendant's hitchhiking story is also at odds with his December 4, 1957, statement to Oswald that he was not in Sycamore on the night of December 3.

¶ 119    The only FBI report containing information that could conceivably have been useful to defendant at trial was the one concerning the 6:57 p.m. telephone call, although it does not cinch an alibi for 6 p.m. and is inconsistent with Ralph's and Eileen's reports that the call was made at 7:10 p.m. However, the report contains three levels of hearsay: the telephone company's general manager's statement as to what the telephone records showed; the telephone records; and the caller's statement supplying his name to the operator.

¶ 120    Arguably, the telephone records could have been admitted under Illinois Rule of Evidence 803(6) (eff. Jan. 1, 2011) as business records if they existed and had a proper foundation. See *United States v. Towns*, 718 F.3d 404, 408-09 (5th Cir. 2013) (proper foundation for business record is laid by affidavit that attests to the requisite elements of Rule 803(6)). Pursuant to Rule 803(6), records are not excluded by the hearsay rule if they were made at or near the time by a person with knowledge; if they were kept in the course of a regularly conducted business activity; and if it was the regular practice of that business activity to make the record. Ill. R. Evid. 803(6) (eff. Jan. 1, 2011).

¶ 121    Unfortunately, the FBI did not procure the actual telephone records but relied solely on the general manager's representation as to what they contained. Furthermore, multiple hearsay is excused by Rule 803(6) only where both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business. *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271-72 (5th Cir. 1991) (hospital records were admissible as business records but statement of informant contained in hospital records was second level of hearsay needing its own exception); *Alzuraqi v. Group 1 Automotive, Inc.*, 921 F. Supp. 2d 648, 671 (N.D. Tex. 2013) (if customer surveys fell within business-records exception to hearsay rule, the contents of the surveys were hearsay because the sources of the contents were outsiders). Thus, if the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. *Wilson*, 939 F.2d at 271. The outsider's statement must fall within another hearsay exception to be admissible, because it does not have the presumption of accuracy that statements made during the regular course of business have. *Wilson*, 939 F.2d at 271.

¶ 122    Here, defendant sought to show not only that a telephone call was made at 6:57 p.m. from a number in Rockford to a number listed to Ralph Tessier in Sycamore but that *he* made the call. According to the FBI report, the call was collect, meaning that it went through an operator. Necessarily, the person making the call gave the operator a name. The person making the call would be an outsider not acting in the regular course of the telephone company's business. The operator generally would have no personal knowledge of the caller. Therefore, the name of the caller would not be covered by Rule 803(6). The accuracy of the information in the FBI report is further diluted by the fact that the operator wrote the name "Tassier," and it was only the manager's opinion that the operator had misspelled "Tessier."

¶ 123    Furthermore, the record shows that defendant's alibi, as he related it to Steiger and Ciesynski in July 2011, was placed before the trier of fact. Defendant told Ciesynski that he was in Chicago. During the trip from Seattle, he kept emphasizing to the detectives to pay attention to how much time it took to get from Chicago to Sycamore. Defendant told Steiger that he hitchhiked from Chicago to Rockford because Rockford was close to Sycamore; that he called his father from Rockford but his father could not pick him up; and that he hitchhiked from Rockford to Sycamore. Accordingly, we find no error in the trial court's denial of the motion to admit the FBI reports.

¶ 124                    2. Patrick Solar's Testimony

¶ 125    Defendant next contends that it was error to exclude Solar's testimony regarding a suspect that the Sycamore police developed in 1996. Defendant wanted to call Solar to testify that the facts of a 1951 murder in Pennsylvania "closely matched" the Ridulph case. In the Pennsylvania case, according to Solar's 1997 report, Redmond, a transient laborer employed

by a local carnival, was suspected of "tempting" an eight-year-old girl away from a carnival ride and sexually assaulting her. The Pennsylvania case went cold until 1988. Redmond's fingerprint was found in the truck in which the victim was found. According to Solar's report, while he was in jail in 1988, Redmond made comments about being involved in "one other" child abduction case. Solar speculated that "this could have been the Ridulph case." Redmond died in Nebraska in 1992 without ever standing trial for the 1951 murder. Solar noted that Redmond had been a truck driver and that Route 20 extended west into Nebraska where Redmond lived.

¶ 126    An accused may, within certain limits, attempt to prove that someone else committed the crime with which he is charged. *People v. Ward*, 101 Ill. 2d 443, 455 (1984). The test of admissibility is whether the evidence "fairly tends" to prove the particular offense with which the defendant is charged. (Internal quotation marks omitted.) *Ward*, 101 Ill. 2d at 455. The court may reject the offered evidence as irrelevant "if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature." *Ward*, 101 Ill. 2d at 455. It is within the court's sound discretion whether to admit such evidence, and the court's ruling will not be reversed absent an abuse of discretion. *Ward*, 101 Ill. 2d at 455-56.

¶ 127    Defendant argues that Redmond's status as a suspect was admissible because the "essence" of the State's theory against defendant was that he was not seen in town on the night of Maria's abduction, permitting a defense that another man could have been present in town at the time with opportunity to commit the crime.

¶ 128    We disagree with defendant as to what the essence of the State's case was. The essence of the State's case was the totality of the circumstances, including: Chapman's positive eyewitness identification; the fact that defendant lived a block or two from Maria's house; that "Johnny" was defendant; that defendant misled authorities about whether his car was disabled; that defendant gave an incredible account of his whereabouts to the Seattle detectives; and that defendant made admissions about how he killed Maria and disposed of her body in an area with which he was familiar.

¶ 129    We also disagree with defendant that Redmond's status as a suspect has any relevance. There was no showing that Redmond had ever been in Illinois, let alone that he was in or near Sycamore on December 3, 1957. That Redmond's home was two states away in Nebraska, albeit on Route 20, hardly places Redmond in the vicinity of the crime or in the vicinity of where Maria's body was found. Further, Solar's report was full of wild speculation. Solar noted that Redmond was fond of wearing "longshoreman type" sweaters and that his nickname was "Billy," as if a sweater of any type was similar to the sweater with many colors that Chapman described, and as if "Billy" were interchangeable with "Johnny." Also, there was no physical evidence that Maria was sexually assaulted. It is telling that Solar penned the report for the purpose of bringing closure to the town of Sycamore on the 40th anniversary of Maria's disappearance, an event that Solar said had "a great impact on our community." It is apparent that Solar's report was designed to reassure the community that a deceased outsider, not one of their own, committed the crime. Solar even admitted in the report that "[w]e will never know for certain if Redmond was responsible."

¶ 130    The present case is unlike *People v. Simmons*, 372 Ill. App. 3d 735 (2007), upon which defendant relies. In *Simmons*, the appellate court reversed the trial court's ruling that the defendant's proffered evidence that Pace committed the crime was too remote and speculative, where police had actually investigated Pace for the crime and where other

witnesses, as well as Pace himself, made statements implicating Pace. *Simmons*, 372 Ill. App. 3d at 746-50. Here, Redmond was not a suspect at the time of the crime, nor was he a suspect in the 2008 investigation that culminated in defendant's arrest. According to Solar's report, in 1996, a Pennsylvania state trooper became convinced that Redmond probably committed the crime, and the trooper in turn convinced Solar. However, as we pointed out, nothing but speculation linked Redmond to the Ridulph case. Accordingly, the trial court did not abuse its discretion in excluding Solar's testimony. For the above reasons, we conclude that defendant was not deprived of the right to present a defense.

¶ 131                    C. Whether Other Evidence Was Admissible

¶ 132    Defendant next raises the issue of the admissibility of Eileen's deathbed statement, Long's testimony that Johnny had given her piggyback rides, and the evidence that defendant had ammunition in his safe when authorities executed the 2011 search warrant at his Seattle home.

¶ 133                    1. Eileen's Deathbed Statement: "John Did It"

¶ 134    We first address the deathbed statement in which Eileen told Janet that "John did it." The trial court admitted Eileen's statement as a statement against her penal interest, the theory being that Eileen lied to the FBI in 1957, when she told them that defendant was at home on the evening of Maria's disappearance. The State theorizes that Eileen's 1994 statement acknowledged the 1957 lie and subjected her to possible prosecution for obstruction of justice 37 years later while she lay dying from metastatic cancer. The State also posits that Eileen could have waived any statute of limitations, thus clearing the way for her own prosecution.

¶ 135    A hearsay exception applies to declarations against penal interest. *People v. Tenney*, 205 Ill. 2d 411, 433 (2002). Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011) provides that a statement that tends to subject a declarant to civil or criminal liability, and that is corroborated, is admissible. Our supreme court in examining Federal Rule of Evidence 804(b)(3), which is identical to our rule, stated that three conditions must be met before a statement will be admitted under the rule: (1) the declarant must be unavailable; (2) the declarant's statement must have been against his or her penal interest; and (3) corroborating circumstances must support the trustworthiness of the statement. *People v. Rice*, 166 Ill. 2d 35, 43 (1995). Whether to admit evidence is within the trial court's discretion, and its ruling will not be reversed absent an abuse of that discretion. *Ward*, 101 Ill. 2d at 455-56.

¶ 136    Here, Eileen was unavailable at the time of trial, due to her death. However, we conclude that Eileen's statement was not against her penal interest. The statement itself must, on its face, be self-incriminating. *People v. Williams*, 193 Ill. 2d 1, 19-21 (2000). In *Williams*, our supreme court stated that under Federal Rule of Evidence 804(b)(3) only statements "which are themselves self-inculpatory" may be admitted. *Williams*, 193 Ill. 2d at 22. Our supreme court derived this interpretation from *Williamson v. United States*, 512 U.S. 594, 599 (1994), in which the United States Supreme Court held that the federal rule covers only "those declarations or remarks *** that are individually self-inculpatory."

¶ 137    Eileen's statement that "John did it" did not, on its face, admit that Eileen had committed a crime. To reach that interpretation, the State had to introduce the inadmissible hearsay

statement of what Eileen told the FBI and then speculate that Eileen could have been prosecuted for obstruction of justice 37 years later while she lay dying of metastatic cancer. Nothing in either of Eileen's statements, either the deathbed statement or the statement to the FBI agents, was facially self-inculpatory. Accordingly, the trial court erred in admitting the deathbed statement. Because we find error in the statement's admission pursuant to Rule 804(b)(3), we do not address defendant's additional argument that the statement did not meet the trustworthiness guidelines set forth in *Chambers v. Mississippi*, 410 U.S. 284 (1973).

¶ 138    The State argues that the admission of Eileen's statement was harmless error and cites the general rule that, on review after a bench trial, it is presumed that the trial court considered only admissible evidence. See *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). However, as defendant points out, where the trial court admits improper evidence over the defendant's objection, the presumption that the trial court considered only admissible evidence is negated. *People v. Robinson*, 368 Ill. App. 3d 963, 975 (2006). Nevertheless, error in the admission of evidence is harmless where there is no reasonable probability that the defendant would have been acquitted in its absence. *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990). We agree that the error was harmless. The trial court did not mention Eileen's deathbed statement in its ruling, and, as we demonstrated in our reasonable-doubt analysis, the evidence apart from Eileen's statement was sufficient to allow any rational trier of fact to find that the elements of the offenses had been proved beyond a reasonable doubt.

¶ 139                    2. Long's Testimony About Prior Piggyback Rides

¶ 140    We next consider the admissibility of Long's testimony that a man named Johnny gave her piggyback rides. Defendant argues that Long's testimony was irrelevant because she did not identify defendant as Johnny and because Long's piggyback rides occurred a substantial time before December 3, 1957. He also argues that her testimony was prejudicial, because the State elicited that her father pulled her off Johnny's back during the last piggyback ride. Defendant categorizes Long's testimony as "other crimes" or "other bad acts" evidence but questions whether giving someone a piggyback ride in bucolic 1957 Sycamore was a crime or a bad act.

¶ 141    Prior to trial, the State filed a motion to introduce "conduct" other than that charged in the indictment. The State represented that Long would testify that "everyone in the neighborhood knew the defendant as 'Johnny' " and that Long knew him as "Johnny Tessier." At trial, Long did not identify defendant as "Johnny."

¶ 142    While we do not believe that Long presented other-crimes or other-bad-acts evidence (despite Long's father's ire), we nevertheless agree with the State that her testimony was relevant as tending to prove Johnny's identity. Relevant evidence is evidence having any tendency to make the existence of any fact of consequence to the determination of the outcome more probable than not. *People v. Boclair*, 129 Ill. 2d 458, 477 (1989). Evidentiary rulings are within the trial court's sound discretion and will not be disturbed unless the trial court abused its discretion. *Boclair*, 129 Ill. 2d at 476. In our case, the identity of the perpetrator was the only question of consequence, given that the crime itself was not at issue. Long's testimony tended to prove that defendant was the perpetrator, for three reasons: (1) Long's description of the "Johnny" who gave her piggyback rides was similar to Chapman's description of the man who introduced himself to her as Johnny, whom Chapman identified as defendant; (2) Long testified that the last piggyback ride occurred by "Old Man Tessier's"

house, which was in Long's backyard, thus providing a link to defendant; and (3) Long corroborated Diaz's testimony that he overheard defendant say that he gave another little girl a piggyback ride near his grandfather's house.

¶ 143 Defendant maintains that the significant lapse of time between Long's piggyback rides and December 3, 1957, rendered Long's testimony irrelevant. Long testified that she was in grade school when Johnny gave her piggyback rides, which she testified was "way before" Maria's disappearance. Defendant's argument is unpersuasive. As explained above, Long connected defendant to Maria's disappearance with her description of Johnny and by tying Johnny to defendant's grandfather's house. Consequently, the trial court did not abuse its discretion in allowing Long's testimony.

¶ 144                 3. Testimony That Ammunition Was Found in Defendant's Safe

¶ 145 Next, we address defendant's argument that testimony of the presence of ammunition in his home safe 50-plus years after the crime was irrelevant and prejudicial. The State apparently introduced this evidence to show that the identity of the person who opened the safe was not public knowledge, in order to corroborate Swaggerty's testimony. Defendant does not contest the admission of the evidence of who opened the safe, but confines his argument to the prejudicial impact of the presence of ammunition. We agree with defendant that the evidence of the presence of ammunition was irrelevant. However, we do not agree that the evidence was prejudicial. There was no showing that defendant's possession of ammunition was illegal or that a gun played any part in Maria's abduction and murder.

¶ 146             D. Whether Defendant's Convictions of Kidnapping and
Abduction of an Infant Must Be Vacated

¶ 147 Defendant's final contention is that his convictions of kidnapping and abduction of an infant must be vacated, as the State failed to prove any exception to those crimes' three-year statutes of limitations in effect in 1957, or, in the alternative, that the conviction of kidnapping must be vacated as violating one-act, one-crime principles. The State does not respond on the merits but dismisses defendant's arguments by saying that defendant was not sentenced on the convictions of kidnapping and abduction. The record indicates otherwise. In the court's oral pronouncement, it sentenced defendant to five years' incarceration for kidnapping and to seven years' incarceration for abduction of an infant. The court then provided that both *sentences* would "merge" into the natural-life *sentence* for murder. The court's oral pronouncement was memorialized in a written order dated and filed on December 10, 2012. Because the State, in essence, concedes that sentences need not enter on these counts, and because it conceded at oral argument that it did not adduce any proof that would toll or extend the limitations periods, and further does not contend that defendant forfeited the issue, we vacate defendant's convictions of kidnapping and abduction of an infant.

¶ 148                         III. CONCLUSION

¶ 149 For the reasons stated, we affirm defendant's murder conviction and vacate his convictions of kidnapping and abduction of an infant.

¶ 150        Affirmed in part and vacated in part.